IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| SADLER CLINIC PLLC, | § | CASE NO._____ |
| | § | |
| and | § | |
| | § | |
| MONTGOMERY COUNTY | § | CASE NO._____ |
| MANAGEMENT COMPANY, LLC | § | |
| | § | |
| Debtors. | § | Joint Administration Requested |
| | § | |
| | § | (Chapter 11) |

AFFIDAVIT OF JOHN T. YOUNG, JR.
IN SUPPORT OF FIRST DAY MOTIONS

Before the undersigned notary public appeared John T. Young, Jr. who, after being sworn, testified as follows:

1.      I currently serve as the Chief Restructuring Officer (the "CRO") of Montgomery County Management Company, LLC ("MCMC"), and have been serving in that capacity since May 11, 2012.

2.      In my capacity as the CRO, I am familiar with the daily operations, financial conditions and the books and records of MCMC and its parent company Sadler Clinic, PLLC ("Sadler"; and together with MCMC, the "Debtors").   I hereby submit this affidavit (the "Affidavit") in support of the Debtors' first day motions in the above-captioned chapter 11 cases and to assist the Court and other parties-in-interest in understanding the circumstances leading up to the commencement of these cases.  Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents or my

opinion based upon my experience, knowledge and information concerning the Debtors' operations, financial condition and the industry as a whole. If called to testify, I would testify competently to the facts set forth herein. I am authorized by the Debtors to submit this Affidavit.

## I. BACKGROUND

3.     On June 15, 2012 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended, the "Bankruptcy Code"). The Debtors continue to maintain their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtors' bankruptcy cases and no official committee of unsecured creditors has been established.

4.     The purpose of the Debtors filing chapter 11 is to wind-down their operations, including, but not limited to, monetizing the Debtors' assets (including accounts receivable, inventory and remaining equipment), assisting in the transition of physicians and staff to new practices for continuity of care to patients, liquidating claims through the claims objection process and confirming a liquidating plan under the Bankruptcy Code. The Debtors are not providing medical services to the public. All employees have been terminated, except an administrative staff of the Debtors to oversee the final phase of the Debtors' liquidation.

5.     The Board of Managers of Sadler is now occupied by two remaining physicians, Dr. Leslie Schoppe and Dr. Mark Wilkerson. The only officer remaining at MCMC is the Chief Restructuring Officer John Young.

**A.    Debtors' Business**

6.    The Debtors operated a multi specialty physician clinic known as Sadler Clinic ("Sadler Clinic").  Sadler Clinic was founded in 1958 by Dr. Deane Sadler, Dr. Irving Watson and Dr. Walter Wilkerson.  Sadler Clinic grew steadily through the years.  At its peak in 2010, Sadler Clinic had 13 locations, over 100 providers, and a staff of more than 600 healthcare professionals.  In 2010, the Debtors annual revenue exceeded $250,000,000.

**B.    Corporate Structure**

7.    Sadler is a Texas professional limited liability company.  MCMC is a Texas limited liability company and a wholly-owned subsidiary of Sadler.  Sadler and MCMC are parties to a certain Management Services Agreement, dated as of January 1, 2001 (the "Management Services Agreement").  Under the Management Services Agreement, Sadler is responsible for, among other things, (i) providing professional medical services to patients, (ii) monitoring the quality of medical care at Sadler Clinic, and (iii) hiring, supervising and terminating physician employees.  MCMC, on the other hand, is responsible for, among other things, (i) managing all day-to-day functions of Sadler Clinic and (ii) relieving Sadler of administrative, accounting, personnel and business aspects of Sadler's medical practice.

8.    The physicians at Sadler Clinic provided patient care and billed either the patient or a third party payer. With its administrative personnel, MCMC monetized the receivables and then paid the physicians, staff, vendors, and real estate lessors.

9.    Upon the termination of the Management Services Agreement by either Sadler or MCMC or upon expiration of the agreement, Sadler agreed to, among other things, assume all debts and contracts, payables and leases which are obligations of MCMC related to MCMC's performance under the Management Services Agreement.

### C.    Physician Employees

10.    Sadler required each physician employee to enter into an employment agreement, whereby the physician agreed not to, for a period of either twelve (12) or eighteen (18) months following termination of employment by Sadler Clinic, directly or indirectly practice medicine or surgery, or assist some other person or entity to practice medicine or surgery, or form or own an interest in a business that practices medicine or surgery, within the geographic limit of the particular doctor's noncompete area (the "Non-Compete Provisions").  Sadler's major secured creditor, Woodforest (defined below) and, later, HCA (defined below) required Sadler to have in place with each physician a contract with the Non-Compete Provisions.  The revenue generated from treating patients at Sadler was, until recently, the primary asset of the Debtors.  The Non-Compete Provisions were intended to, among other things, protect the revenue from treating patients.

11.    Sadler compensated its physicians under an income distribution plan (the "IDP").  Pursuant to the IDP, the physician employees received compensation based on one of four different models including: a model that is tied to the individual physician's performance and the overall performance of the clinic; a salary model; a per-diem model and an hourly model.

### D.    Pre-Petition Financing

12.    Prior to February 17, 2012, MCMC borrowed monies from Woodforest National Bank ("Woodforest") under a loan and security agreement (the "Loan") to finance its operations.  In addition, the Debtors also financed their business through vendor and equipment financing.

13.    As described below, the Debtors began experiencing financial issues after the departure of a significant number of its physicians in 2010.  The Debtors' revenues decreased immediately and over the following months, collections decreased.  The Debtors received some

special income including income from asset sale and an insurance recovery, during the months following the physician departures that helped offset some of these losses.  The cost of running Salder Clinic, however, remained at pre-departure levels.  Soon, the creditors could not be paid timely and a back log of accounts payable built up.  The Debtors tried to manage vendors on a case-by-case-basis.

14.     In an effort to solve the financial difficulties facing the Debtors in 2010, the Debtors explored various opportunities for restructuring its business and operations.  The Debtors had discussions with Hospital Corporation of America (together with its affiliates, "HCA"), Memorial Hermann, St. Luke's Hospital, and other health providers.  Sadler decided that a concept discussed with HCA made the most sense.  Sadler had been in negotiations with HCA since 2010 and renewed their efforts in earnest to 2011 to do a sale-lease back and a management service agreement.  Nevertheless, the transaction with HCA did not close until February 2012.

15.     On or about February, 17, 2012, the Debtors sold the majority of their assets to HCA for approximately $21.3 million pursuant to the Asset Purchase Agreement (defined below).  On the same date, the Debtors entered into the Affiliation Agreement (defined below) whereby HCA initially advanced the Debtors approximately $3.4 million.  Of the approximately $24.7 million in proceeds from the Asset Purchase Agreement and the Affiliation Agreement, $11.9 million were used to pay down the Loan.  The remaining proceeds were used to pay down all vendors that had any liens on the Debtors' assts and to catch up on any past due amounts and real estate leases.

16.     As of the Petition Date, the Debtors' capital structure is (a) a disputed secured claim by HCA in the amount of approximately $3.5 million, (b) approximately $1.7 million in priority unsecured claims that include, among other things, certain unpaid employee claims, (c) approximately $31.0 million in general unsecured claims that include, among other claims (i) vendor claims, (ii) real estate lessor claims, (iii) damages claims, and (iv) claims against Sadler's Supplemental Retirement Plan (the "SERP").[1]  As of the Petition Date, the major assets of the Debtors are: (a) accounts receivable, (b) inventory, (c) assets in the SERP, (d) claims and recoveries under various lawsuits, and (e) equipment.  The Debtors' balance sheet as of the Petition Date is set forth in **Exhibit A**.[2]

## II. EVENTS LEADING UP TO THE
## COMMENCEMENT OF THE CHAPTER 11 CASES

### A.     Physician Departures

17.     In April 2010, twenty-four physicians, representing approximately twenty percent of Debtors' total physician employees, resigned from and filed suit against Sadler, seeking to invalidate their covenants not to compete (together with later departing physicians, the "Departing Physicians").  After the Departing Physicians left Sadler Clinic, the Debtors' revenue decreased substantially.  At the same time, the Debtors were unable to reduce their expenses proportionally.  The Debtors sought to enforce the non-compete provisions in the Departing Physician's employment agreements.  The Debtors, however, received unfavorable rulings, allowing other physicians to leave Sadler Clinic and establish practices near Sadler.   Some of

---

[1]     This is an estimate of total real estate damages that is not capped under section 502(b)(c) of the Bankruptcy Code.

[2]     These are the April 2012 balance sheets.  Significant adjustments will be made for May and June.

the adverse rulings are on appeal.

18.     In an effort to correct the revenue loss, Sadler hired new physicians to replace the Departing Physicians.  Nevertheless, many of the new physicians were not able to generate the revenues the Debtors needed to cover the new physicians' salaries, costs and expenses.

**B.     Affiliation with HCA**

19.     To address their financial and operations problems, the Debtors sought a strategic partner.  During 2010, the Debtors began negotiating with HCA.  After arduous negotiations, Sadler entered into a sale-lease back transaction and an affiliation agreement with HCA.

20.     On or about February 17, 2012, the Debtors and HCAPS Conroe Affiliation, Inc., an affiliate of HCA, entered into (i) an Asset Purchase Agreement, dated as of February 17, 2012 (the "Asset Purchase Agreement") and (ii) an Affiliation Agreement, dated as of February 17, 2012 (the "Affiliation Agreement").   The Asset Purchase Agreement provided for, among other things, the sale of certain of the Debtors' equipment, furniture, fixtures and software to HCA for $21,296,726.00.  The Affiliation Agreement provided for, among other things, (i) a lease of the equipment, furniture, fixtures and software sold under the Asset Purchase Agreement back to the Debtors, and (ii) a revenue participation whereby HCA agreed to make capital advances to Sadler in the aggregate amount of $8,927,023.00 in exchange for monthly payments equal to 3.5% of the Debtors' revenue for the next 40 years.[3]   Of the $8,927,023.00, HCA advanced $3,412,110.22 on the effective date of the Affiliation Agreement.  The Debtors used the monies to pay off outstanding balances owed to certain of the Debtors' creditors.  HCA never advanced

---

[3]     This paragraph is intended for summary purposes only and reference should be made to the Asset Purchase Agreement and the Affiliation Agreement for the specific details of these agreements.

the remaining $5,514,912.78.  The Affiliation Agreement required the Debtors to pay all the vendors current on a go forward basis.  This requirement resulted in new liquidity problems for the Debtors.

### C.    Continued Liquidity Issues Facing Debtors

21.    The Asset Purchase Agreement and Affiliation Agreement did not solve the Debtors' problems.  Insufficient funds precluded the Debtors from right sizing its balance sheet. The Debtors faced almost immediate defaults under key obligations after it closed the February 2012 transactions with HCA.

22.    During March 2012, the Debtors requested funds from HCA under the Affiliation Agreement to cure certain defaults.  HCA did not advance the requested funds.

23.    During April 2012, based on the recommendation of the advisory board established under the Affiliation Agreement, HCA sent a team of professionals to the Debtors' headquarters to analyze the Debtors' finances and operations and to advise the Debtors on a turnaround strategy.  HCA began interviewing the Debtors' physicians to determine which physicians should be retained by the reorganized Sadler Clinic.  HCA interviewed physicians for a few days and then abruptly cancelled future interviews, without advance notice to the Debtors. Certain physicians began looking for positions elsewhere.  HCA never gave a formal recommendation or report in connection with the April 2012 analysis and interviews.

24.    The Debtors made additional funding requests to HCA under the Affiliation Agreement.  HCA rejected all these funding requests.  Because HCA had a lien on the Debtors' accounts receivable, the Debtors lacked unencumbered assets to get temporary financing from

another source.

25.     With no alternative financing source, the Debtors had to operate exclusively on cash realized from collection of accounts receivable.  These funds proved insufficient to sustain operations.

26.     At the beginning of May 2012, the Debtors began defaulting on numerous obligations.   During this time, the Debtors prepared an operational and financial restructuring plan.  HCA, whose support was critical to implementing the plan, was unwilling to support the restructuring plan.  In May 2012, HCA took the position that Debtors had not used the correct form attached to the Affiliation Agreement to request the funds and, therefore, the funds would not be disbursed.  By waiting several weeks before taking this position, HCA was able to point to certain monetary and nonmonetary defaults by Debtors as an excuse to not further perform under the Affiliation Agreement.  As a result, Debtors found themselves in continuing defaults under various obligations.

27.     In an effort to develop an operating chapter 11 model, the Debtors prepared operational and financial restructuring plans.   Pursuant to one of the plans, the Debtors terminated certain low-producing doctors, consolidated from 11 locations to four locations and decreased the amount of equipment leased from HCA.  The Debtors considered implementing its restructuring plan through a chapter 11 plan of reorganization which would cap the damage claims under long-term leases.

28.     HCA's support was critical to the success of the reorganization as HCA owned a significant part of the Debtors' equipment and HCA was the exclusive source of funding

available to the Debtors.  The Debtors presented its plan to HCA on or about May 9, 2012.  HCA subsequently informed the Debtors that they were unwilling to support the Debtors' restructuring plan.  On May 30, 2012, HCA sent a letter to the Debtors terminating the Affiliation Agreement.

29.     The Debtors are now preparing for an orderly liquidation.  Over the last several weeks, the Debtors have terminated nearly all of its physician employees and staff.  The Debtors are also working with its former physician employees and its landlords to assign leases to the physicians and reduce the lease damages against the Debtors.  The Debtors are also working with HCA to protect HCA's equipment and re-deploy the equipment to the Debtors' former physicians.  Finally, the Debtors are working on formulating a long-term plan to maintain medical records and address requests for medical records from doctors and patients.

30.     While HCA has made statements to the Debtors indicating a willingness to support the orderly liquidation, it has taken actions to impair the liquidation effort.  On the evening of June 13, 2012, HCA sent letters to Woodforest with instructions not to accept any direction, instructions or entitlement orders with respect to the Debtors' bank accounts from any party other than HCA.   On the evening of June 13, 2012 and on June 14, 2012, representatives of the Debtors informed HCA that there were two outstanding checks that should be paid.  One check was for the physicians' tail insurance coverage.  The other check was for the vendor responsible for collecting the accounts receivable.

31.     The payment of physician's tail insurance coverage is critical to the Debtors' estates.  After a physician leaves Sadler, his or her basic malpractice insurance coverage ceases.  Tail insurance covers claims asserted after the period covered by the physician's basic insurance

and arising from occurrences during the insured period.  The physician has 30 days to fund his or her policy from the day the physician leaves Sadler.

32.     Prior to the physicians leaving Sadler, Sadler deducted the tail insurance premium from the physicians' paychecks.  A few days prior to the Petition Date, the Debtors sent the insurance carrier a check for payment of the tail insurance coverage.  However, the check was not processed before HCA blocked the Debtors' bank accounts.

33.     By failing to pay the tail insurance coverage, the Debtors' estates face substantial contingent liabilities that could dilute recoveries for creditors.  The physicians will assert claims against the Debtors for the Debtors' failure to pay the tail insurance coverage.  In addition to the direct damages on such claims which should equal the amount of the insurance premium, the physicians may assert incidental, consequential and indemnification claims in connection with the Debtors' failure to make these payments.  Even if the Debtors' are successful in defending these claims, the Debtors' would incur substantial administrative expenses litigating the allowance of such claims.  Accordingly, the Debtors believe it is in the best interest of their estates to make the tail insurance premium payment and told this to counsel to HCA.

34.     Sadler requested HCA to authorize Woodforest to release the funds for the tail insurance payment.  Sadler's representatives informed counsel to HCA that time was of the essence because the 30 day period would soon expire.  HCA refused to release the funds.

35.     Similarly, the Debtor requested HCA to authorize Woodforest to release funds to pay the Debtors' accounts receivable vendor.  The Debtors' accounts receivable vendor is responsible for the monetization of the accounts receivable.  The monetization of the Debtors'

accounts receivable is critical to the orderly liquidation of the Debtors' estates.  Furthermore, the monetization of the accounts receivable is necessary for the Debtors' creditors, including HCA, to receive any recovery.  Representatives of the Debtors informed counsel to HCA of the foregoing and requested HCA to releases the funds necessary to pay the Debtors' accounts receivable vendor.  Again, HCA refused to release the funds.

### III. SUMMARY OF DEBTORS' PLAN OF LIQUIDATION

36.     On the Petition Date, the Debtors filed their *Plan of Liquidation of Sadler Clinic PLLC and Montgomery County Management Company, LLC Under Chapter 11 of the Bankruptcy Code* (the "Plan").  The Plan provides for the liquidation of the Debtors through transfer of all of the Debtors' assets to a liquidation trust (the "Liquidation Trust").  The trustee of this trust (the "Liquidation Trustee") will collect the Debtors' accounts receivable and monetize all other assets for the benefit of the Debtors' creditors.  The Plan contemplates the substantive consolidation of the Debtors, and transfer of all of their assets and creditor claims into a single trust.

37.     The Liquidation Trustee will be in charge of monetizing for the benefit of the Debtors' creditors all of the assets of the Debtors including the Debtors' accounts receivable. These receivables include Medicare, Medicaid and other receivables subject to strict regulations and procedures for collection.  The Debtors' core team is uniquely qualified to quickly and successfully monetize these receivables.

38.     The Plan will provide for the implementation of procedures to maintain medical records and address requests for medical records from doctors and patients.  Attached as **Exhibit**

**B** is Sadler's current Health Care Records Maintenance Plan.

39.     The Plan provides for the orderly liquidation of the Debtors' assets through a process that will maximize the value of these assets for the benefit of creditors while protecting physicians' and patients' interests in their medical records.

### IV. FACTS IN SUPPORT OF
### FIRST DAY MOTIONS[4]

**A.     Emergency Motion For Order (I) Authorizing Payment of Employee Obligations and (II) Granting Related Relief (the "Employee Obligations Motion")**

40.     The Debtors have reduced the number of employees to a core group.  The core group is essential to effectively liquidate the Debtors' assets.  The core group of employees include: the executive director, the chief financial officer, the controller, an office manager, a payroll clerk, a risk manager, a benefits coordinator, two maintenance technicians, two medical records specialists, a courier, a warehouse employee, an accounts payable clerk, and a payment poster.   A list of the employees' titles, their compensation, and the amount owed as of the filing date is attached to the Employee Obligations Motion.

41.     Continued service by the Debtors' employees is vital to the Debtors' successful liquidation and the Debtors' ability to address issues related to medical records.  All of the Debtors' remaining employees have skills and specialized knowledge that are critical to the Debtors' orderly liquidation.  While the Debtors or the Liquidation Trustee could try and replace these individuals, it would take time, money, and would divert management from other more important matters essential to maximizing recoveries for creditors.

---

[4]     In this section, capitalized terms used but not defined herein have the meaning assigned to the term in the applicable motion or application.

42.     Many of the Debtors' employees simply cannot afford to miss a paycheck and any disruption in pay will most certainly result in some employees seeking employment elsewhere. Accordingly, it is absolutely critical to the Debtors' liquidation efforts that the Debtors maintain their employees and continue to compensate their employees in the ordinary course. Accordingly, the Debtors seek authority to honor the various categories of employee obligations including employee compensation and payroll taxes, accrued vacation pay plans, and health care benefits.

43.     The Debtors also seek authority to pay the Debtors' medical malpractice tail insurance premium.   As indicated above, after a physician leaves Sadler, his or her basic malpractice insurance coverage ceases.   Tail insurance covers claims asserted after the period covered by the physician's basic insurance and arising from occurrences during the insured period.   The physician has 30 days to fund his or her policy from the day the physician leaves Sadler.

44.     Prior to the physicians leaving Sadler, Sadler deducted the tail insurance premium from the physicians' paychecks.   A few days prior to the Petition Date, the Debtors sent the insurance carrier a check for payment of the tail insurance coverage.   However, the check was not processed before HCA blocked the Debtors' bank accounts.

45.     The payment of physician's tail insurance premium is critical to the Debtors' estates.   By failing to pay the tail insurance premium, the Debtors' estates face substantial contingent liabilities that could dilute recoveries for creditors.   The physicians will assert claims against the Debtors for the Debtors' failure to pay the tail insurance premium.   In addition to the

14

direct damages on such claims which should equal the amount of the premium, the physicians may assert incidental, consequential and indemnification claims in connection with the Debtors' failure to make this payment.  Even if the Debtors' are successful in defending these claims, the Debtors' would incur substantial administrative expenses litigating the allowance of such claims. Accordingly, the Debtors believe it is in the best interest of their estates to make the tail insurance premium payment and told this to counsel to HCA.

B.    **Emergency Motion for Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Bankruptcy Code § 363, (II) Granting Adequate Protection Pursuant to § 363; and (III) Setting Final Hearing Pursuant to Bankruptcy Rule 4001 (the "<u>Cash Collateral Motion</u>")**

46.    The Debtors seek authority on an interim and final basis to use Cash Collateral as defined in the Bankruptcy Code and to grant adequate protection to HCA who asserts an interest in the Cash Collateral.  As of the Petition Date, HCA has advanced approximately $3.5 million under the Affiliation Agreement and has a lien on the Debtors' accounts receivable and cash for this amount.

47.    The Debtors are disputing the allowability of the $3.5 million claim of HCA.  As of the Petition Date, the Debtors have net accounts receivable in the estimated amount of $6,932,779.00.

48.    The Debtors require the use of cash generated from operations in order to continue to liquidate its business and to ensure that adequate cash will be available for associated expenses, including compensation of employees and professionals of the estate.

49.    As adequate protection for the use of collateral, pursuant to section 361(3) of the Bankruptcy Code, there is a sufficient equity cushion in the Debtors' accounts receivable to adequately protect HCA.  HCA's secured claim of approximately $3.5 million is secured by first

priority lien on the Debtors' accounts receivables and cash, which as of the Petition Date was collectively approximately $7 million (cash and net accounts receivable).   Accordingly, HCA is adequately protected because the value of their collateral far exceeds the amount of indebtedness.

50.     An immediate need exists for the Debtors to obtain approval of the use of Cash Collateral in order to pay payroll and other expenses related to the liquidation, as identified in the interim budget ("Interim Cash Collateral Budget") attached to the Cash Collateral Motion.

51.     Without the immediate use of cash collateral for an interim period, the Debtors' ability to liquidate their businesses will be impaired.  Accordingly, it is imperative that the Court immediately set a preliminary hearing on the Cash Collateral Motion and grant interim cash collateral authority.

**C.     Emergency Motion for Order under 11 U.S.C. §§ 105, 345, 363, 364, 1107 and 1108 Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management System (the "Bank Account Motion")**

52.     The Debtors utilize a cash management system in the ordinary course of their business. The Cash Management System is similar to those commonly employed by healthcare businesses of size and complexity comparable to the Debtors. The Debtors' accounts and cash management system are described below, and in a chart showing the Debtors' cash management system is attached as **Exhibit C** hereto.

53.     The Debtors hold ten (10) bank accounts at Woodforest National Bank ("Woodforest") and four (4) bank accounts at JPMorgan Chase Bank, NA.  The JPMorgan accounts were opened in April 2012.  These accounts have never been used and have a zero balance.   Currently, the Debtors' cash management system utilizes only the Woodforest accounts.

16

54.     The Debtors receive three (3) main types of deposits.  All three types of deposits are ultimately held in a Sadler account blocked by Hospital Corporation of America (the "HCA Blocked Account").  Maintaining the existing depository accounts is vital to ensure ongoing collection of accounts receivable and to maximize the value of the Debtors' estates for the benefit of their creditors.

55.     The Cash Management System operates in the following manner. First, governmental wires and ACH deposits are received into a Sadler Medicare/Medicaid depository account.  Funds from this account are swept daily into the HCA Blocked Account.  Second, commercial wires and ACH deposits made by private insurance companies are received in MCMC's operating account.  Each day after any payments are made from MCMC's operating account, the balance of the deposits is swept into the HCA Blocked Account.  To the extent that insufficient deposits exist in MCMC's operating account at the time a payment is to be made, funds drafted from the HCA Blocked Account cover the payment.  Third, business office deposits, including patient checks, are made directly into the HCA Blocked Account.

56.     In addition to depository accounts, MCMC holds a patient refund account and a payroll account, each of which are funded through the HCA Blocked Account.  Sadler holds an accounts payable account, a cafeteria plan account and a payroll account, each of which are also funded through the HCA Blocked Account.  Finally, both MCMC and Sadler hold savings accounts.

57.     The Debtors' cash management system is designed to permit the efficient collection and application of funds.  The Debtors seek permission to continue their existing cash

management system, without opening new debtor-in-possession bank accounts (except to the extent that the Debtors elect to do so in the ordinary course of their businesses). A list of the Debtors' current bank accounts is attached to the Bank Account Motion. The Debtors also seek relief from any requirement that they open new sets of books and records.

58. Permitting the Debtors to maintain their existing bank accounts and existing cash management system (or to make only such changes as are appropriate in the ordinary course of business) will prevent disruption of the Debtors' operations and will not prejudice any party in interest. The Debtors' existing cash management accounts function smoothly and permit the efficient collection of cash for the benefit of the Debtors and all parties in interest. Any requirement that the Debtors open new accounts would potentially result in confusion and delays and hinder the efficient use of the Debtors' resources.

59. The Debtors also seek a waiver of the requirement in the United States Trustee's "Operating Guidelines and Reporting Requirements for Chapter 11 Cases" (the "Trustee's Guidelines") that they open new sets of books and records as of the Petition Date. The Debtors submit that compliance with this requirement would create unnecessary administrative burdens. The Debtors have in place sophisticated, computerized record keeping systems and will be able to differentiate between pre-petition and post-petition transactions. The Debtors have conferred with the United States Trustee.

60. The relief requested in the Bank Account Motion is necessary to preserve business continuity and to lessen the likelihood of disruption to the Debtors' operations. Requiring the Debtors to implement: (a) new bank accounts; (b) a new cash management system;

and (c) the use of new business forms, books and records would place an undue burden on the Debtors and their estates.

**D.    Emergency Motion for Order (I) Authorizing Debtors to Furnish Cash Deposit For Adequate Assurance of Utility Services Under 11 U.S.C. § 366 and (III) Prohibiting Companies From Altering, Refusing or Discontinuing Services**

61.    As of the Petition Date, the Debtors' utilities include: Allied Waste for waste disposal service; City of Conroe for water and sewer services; Consolidated Communications for telephone and internet services; Entergy for electricity; and Optiquest for internet services, server and rack space.[5]

62.    The Debtors seeks an order pursuant to section 366 of the Bankruptcy Code authorizing the Debtors to furnish its pre-petition providers of utility services with adequate protection through a cash deposit, and prohibiting these utility providers from altering, refusing or discontinuing services on account of pre-petition invoices.   If utility companies cease providing service to the Debtors, the Debtors' operations will be stalled, thus jeopardizing recoveries to creditors.

63.    The Debtors intend to provide the Utility Companies with adequate assurance of payment in the form of: (a) prompt and timely payment of post-petition invoices; and (b) upon written request of the Utility Company, a cash deposit equal to fifty percent (50%) of the Debtors' average monthly bill over a three (3) month period of Utility Services with the Utility Company.   The maximum amount of deposits that may be requested is approximately $15,580.53.

---

[5]    The Debtors are currently trying to reduce the amount of server space needed.

64.     The Debtors' prompt and timely post-petition payment of invoices and the payment of reasonable deposits for post-petition services provides adequate assurance to the Utility Companies that the Debtors will satisfy their post-petition obligations.

**E.      Emergency Motion for Entry of an Order Pursuant to Federal Rule of Bankruptcy Procedure 1015(b) Directing Joint Administration of Related Chapter 11 Cases**

65.     The Debtors seek the joint administration of these chapter 11 cases for procedural purposes only pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure.  Joint administration is proper due to the ownership structure of the Debtors.  The Debtors are parent and subsidiary and the business operations of the Debtors are related.

66.     The Debtors intend to file with the Court numerous motions and applications, including the various motions and applications which have been filed on the first day of these bankruptcy cases.  Entry of an order directing joint administration of these cases will eliminate unnecessary delay and expense of duplicative motions, applications and notices.  Finally, this Court will be relieved of the burden of entering duplicative orders and maintaining duplicative files by jointly administering the Sadler and MCMC bankruptcy cases.

67.     The rights of the respective creditors of the Debtors will not be adversely affected by the proposed joint administration of these cases.  The relief sought is purely procedural and is in no way intended to affect substantive rights.

**F.      Notice of Designation as Complex Chapter 11 Bankruptcy Cases**

68.     The Debtors request that these bankruptcy cases be treated as complex chapter 11 cases pursuant to General Order 2000-2.  Pursuant to the Court's requirements, these cases qualify as complex Chapter 11 cases because there is a need for emergency consideration of the

First Day Pleadings, the Debtors have debts in excess of $10,000,000, and there are a large number of parties in these cases.  The Debtors request that the Court enter an order granting these cases complex chapter 11 case treatment.

[INTENTIONALLY LEFT BLANK]

Dated:  June  15  , 2012

Respectfully submitted,

By: _____

John T. Young, Jr.
Chief Restructuring Officer

KAY-LA J. HUGHES
Notary Public, State of Texas
My Commission Expires
June 25, 2013

_____
Notary Public

_____
Commission Expires

EXHIBIT A
FIRST DAY AFFIDAVIT Of JOHN T. YOUNG, JR.

| | |
|---|---|
| **APRIL 2012** | **SADLER PLLC** |
| **BALANCE SHEET** | |
| | |
| | |
| | |
| | |
| Current Assets | |
|   Cash and cash equivalents | (775,809.86) |
|   Accounts receivable, net | |
|   Inventories | |
|   Prepaid expenses | |
|   Other current assets | 26,723.80 |
|   **Total current assets** | **(749,086.06)** |
| | |
| Property and equipment | |
|   Construction In Progress | |
|   Furniture and fixtures | |
|   Medical and office equipment | |
|   Leasehold improvements | |
|   Computer equipment and software | |
|   **Total propertry and equipment** | **-** |
| | |
| Less accumulated depreciation | |
| | |
|   **Property and equipment, net** | **-** |
| | |
| Investment | |
| Investment - SERP | 780,555.59 |
| Other assets | |
| Intangible - Trade Name | |
| Intangible - Non-Competition Agreement | |
| Intangible - Medicare Provider Licenses | 5,308,326.70 |
| (Due to) Due From Sadler (1462/1320) | |
| Due to (Due From) MCMC (1310/2600) | |
| MCMC R/E - Due to (Due From) MCMC | |
|   **Total Other Assets** | **6,088,882.29** |
| | |
|   **Total Assets** | **5,339,796.23** |
| | |
| **LIABILITIES AND MEMBERS' EQUITY** | |
| | |
| Accounts payable and accrued liabilities | (1,973.71) |
| **Accrued compensation and withholdings:** | |
|   Clinic Compensation and Withholdings | |
|   Sadler IDP Salaries Payable | (1,557,696.92) |
|   Sadler Salaried Physician Payable | (174,160.01) |
|   Sadler Benefits Payable | (1,592,027.37) |
| Revolving line of credit | |
| Current maturities of long-term debt | |
| Due to Sadler Clinic  (2600/1310) | |
| Due to MCMC   (1462-1320) | (6,924,243.62) |
| Due to MCMC Real Estate | |

EXHIBIT A
FIRST DAY AFFIDAVIT Of JOHN T. YOUNG, JR.

| | |
|---|---:|
| Other payables and accrued expenses | |
| **Total current liabilites** | **(10,250,101.63)** |
| | |
| Long-Term debt, less current maturities | |
| Catagory A & B Capital Accounts | (3,041,599.88) |
| Catagory D Capital Accounts | (1,300.00) |
| Noncompete Buyout | |
| Retained Earnings - Sadler PLLC | 7,953,205.28 |
| | |
| **Total liabilites and members' equity** | **(5,339,796.23)** |

EXHIBIT A
FIRST DAY AFFIDAVIT OF JOHN T. YOUNG, JR.

| APRIL 2012 | MCMC |
| BALANCE SHEET | |

**Current Assets**

| | |
|---|---|
| Cash and cash equivalents | (1,675,469.65) |
| Accounts receivable, net | 12,005,793.16 |
| Inventories | 698,937.22 |
| Prepaid expenses | 431,782.04 |
| Other current assets | - |
| **Total current assets** | **11,461,042.77** |

**Property and equipment**

| | |
|---|---|
| Construction In Progress | - |
| Furniture and fixtures | 459,260.00 |
| Medical and office equipment | 12,258,776.00 |
| Leasehold improvements | 6,810,086.53 |
| Computer equipment and software | 5,272,208.12 |
| **Total propertry and equipment** | **24,800,330.65** |

| | |
|---|---|
| Less accumulated depreciation | (3,486,303.50) |
| **Property and equipment, net** | **21,314,027.15** |

**Investment**

| | |
|---|---|
| Investment - SERP | |
| Other assets | 447,891.00 |
| Intangible - Trade Name | |
| Intangible - Non-Competition Agreement | |
| Intangible - Medicare Provider Licenses | |
| (Due to) Due From Sadler (1462/1320) | 6,924,243.62 |
| Due to (Due From) MCMC (1310/2600) | |
| MCMC R/E - Due to (Due From) MCMC | 223,591.17 |
| **Total Other Assets** | **7,595,725.79** |

| | |
|---|---|
| **Total Assets** | **40,370,795.71** |

## LIABILITIES AND MEMBERS' EQUITY

| | |
|---|---|
| Accounts payable and accrued liabilities | (6,533,198.33) |
| **Accrued compensation and withholdings:** | |
| Clinic Compensation and Withholdings | (1,504,539.23) |
| Sadler IDP Salaries Payable | |
| Sadler Salaried Physician Payable | |
| Sadler Benefits Payable | |
| Revolving line of credit | |
| Current maturities of long-term debt | (3,257,289.93) |
| Due to Sadler Clinic (2600/1310) | |
| Due to MCMC (1462-1320) | |
| Due to MCMC Real Estate | |

EXHIBIT A
FIRST DAY AFFIDAVIT OF JOHN T. YOUNG, JR.

| | |
|---|---|
| Other payables and accrued expenses | (14,414,402.54) |
| **Total current liabilites** | **(25,709,430.03)** |
| | |
| Long-Term debt, less current maturities | (14,146,916.78) |
| Catagory A & B Capital Accounts | |
| Catagory D Capital Accounts | |
| Noncompete Buyout | |
| Retained Earnings - Sadler PLLC | (514,448.90) |
| | |
| **Total liabilites and members' equity** | **(40,370,795.71)** |

**EXHIBIT B**
**First Day Affidavit of John T. Young, Jr.**
# Heath Care Records Maintenance Plan

1.  Sadler currently has over 300,000 "hard copy"/paper medical records.  These are located at 9201 Pinecroft Drive, The Woodlands; 690 S. Loop 336 West, Conroe; and 1506 South Frazier, Conroe.  In addition, there are over one-million individual electronic health records stored on a server maintained by Optimum Computer Solutions ("OCS").

2.  Sadler continues to contract with Healthport, an organization that asserts it is the nation's largest provider of release of information services and audit management and tracking technology.  Healthport processes and fulfills medical record requests and maintains compliance related to releasing medical information to requesters.  Healthport's staff is responsible for validating and processing all pending and incoming patient requests, and fulfilling them in a legally compliant manner.

3.  Sadler does not currently charge for medical records that are sent directly to another physician.  However, Texas Medical Board Rule 165.1 defines a reasonable fee to be a charge of no more than $25 for the first twenty pages and $.50 per page for every copy thereafter.  For x-rays, $8.00 per film. In addition, a reasonable fee may include actual costs for mailing, shipping, or delivery. The physician shall be entitled to payment of a reasonable fee prior to release of the information unless the information is requested by a licensed Texas health care provider or physician, *if requested for purposes of emergency or acute medical care*.  In the event payment is not included with the request, within ten calendar days from receiving a request for the release of records for reasons other than emergency or acute medical care, the physician shall notify the requesting party in writing of the need for payment and may withhold the information until payment of a reasonable fee is received.

4.  Certain health care providers that have hired former Sadler physicians have expressed an interest in entering into a Medical Records Transfer Agreement to provide for transferring select medical records with respect to those former Sadler physicians.  Sadler is receptive to these arrangements, provided it meets all legal and regulatory requirements.

5.  As an alternative to the foregoing, Sadler will relocate all paper medical records from their facilities in The Woodlands and Conroe to warehouse/office space located in Conroe.  Once this relocation is complete, Healthport staff will be moved to this office space to ensure continuity of medical records access.

6.  Electronic Medical Records are maintained through NextGen Healthcare, a provider of EHR (Electronic Health Records) for physician practices and other healthcare organizations. Physicians who have entered into a formal Business Associate Agreement with Sadler (addressing HIPAA privacy issues), continue to have this information available to them

through OCS, Sadler's third-party IT administrator.  Individual physicians are arranging for transfers of their specific patient-related EHR information directly through OCS to individual NextGen licenses.  All other information will be maintained on a server for Healthport's access as required.

7.  Sadler has also offered Medical Records Transfer and Custody Agreements with those physicians/entities interesting in serving as Records Custodians for specific patients associated with their practices.

8.  In addition to the above measures, Sadler is actively seeking a long-term Records Custodian for remaining patient records, to ensure compliance with the Texas Department of State Health Services Retention Schedule for Medical Records (Guidelines for Doctors' offices and Clinics).

Exhibit C
FIRST DAY AFFIDAVIT OF JOHN T. YOUNG, JR.

