IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **SADLER CLINIC PLLC,** | § | **CASE NO. 12-34546** |
| | § | |
| and | § | |
| | § | |
| **MONTGOMERY COUNTY** | § | **CASE NO. 12-34547** |
| **MANAGEMENT COMPANY, LLC** | § | |
| | § | |
| Debtors. | § | Joint Administration Requested |
| | § | |
| | § | (Chapter 11) |

**DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT
OF SADLER CLINIC PLLC AND MONTGOMERY COUNTY
MANAGEMENT COMPANY, LLC'S CHAPTER 11 PLAN OF LIQUIDATION**

**IMPORTANT NOTICE:** **This is a proposed form of Disclosure Statement for which the Debtors are seeking the Bankruptcy Court's approval. The Bankruptcy Court has not approved this document. Upon approval, the Debtors will distribute this Disclosure Statement to all holders of Claims and Interests who are entitled to vote on the Plan, as well as to all parties who have requested copies of the final Disclosure Statement. No votes are being solicited at this time. Upon approval of this Disclosure Statement, as amended (if appropriate), the Bankruptcy Court will establish deadlines and procedures for the distribution of this document in its final form, in connection with the solicitation of votes.**

DIAMOND McCARTHY LLP
909 Fannin, Suite 1500
Houston, Texas  77010
Telephone: (713) 333-5100
Facsimile: (713) 333-5195

PROPOSED ATTORNEYS FOR
DEBTORS AND DEBTORS-IN-POSSESSION

Dated: June 15, 2012

# TABLE OF CONTENTS

APPENDIX OF EXHIBITS ....................................................................................................iv

I. INTRODUCTION.................................................................................................................5

    A.    FILING OF THE DEBTORS' CHAPTER 11 CASES .........................................................5
    B.    PURPOSE OF THE DISCLOSURE STATEMENT .............................................................5
    C.    HEARING ON CONFIRMATION OF THE PLAN ..............................................................6
    D.    SOURCES OF INFORMATION ......................................................................................7

II. EXPLANATION OF CHAPTER 11..................................................................................8

    A.    OVERVIEW OF CHAPTER 11 .....................................................................................8
    B.    PLAN OF REORGANIZATION OR LIQUIDATION ..........................................................8

III. VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS ........................9

    A.    BALLOTS AND VOTING DEADLINE .............................................................................9
    B.    CLAIMANTS ENTITLED TO VOTE .............................................................................10
    C.    BAR DATE FOR FILING PROOFS OF CLAIM ..............................................................10
    D.    DEFINITION OF IMPAIRMENT ...................................................................................10
    E.    CLASSES IMPAIRED UNDER THE PLAN .....................................................................11
    F.    VOTE REQUIRED FOR CLASS ACCEPTANCE .............................................................11
    G.    INFORMATION ON VOTING AND BALLOTS ...............................................................11
        1.    Transmission of Ballots to Creditors ..........................................................11
        2.    Ballot Tabulation Procedures .......................................................................11
        3.    Execution of Ballots by Representatives ......................................................12
        4.    Waivers of Defects and Other Irregularities Regarding Ballots ................12
        5.    Withdrawal of Ballots and Revocation ........................................................13
    H.    CONFIRMATION OF THE PLAN .................................................................................13
        1.    Solicitation of Acceptances ...........................................................................13
        2.    Requirements for Confirmation of the Plan ...............................................14
        3.    Acceptances Necessary to Confirm the Plan ..............................................15
        4.    Cramdown ......................................................................................................16

IV. BACKGROUND OF THE DEBTORS.............................................................................17

    A.    DEBTORS' BUSINESS ..............................................................................................17
        1.    Corporate Structure ......................................................................................17
        2.    Physician Employees .....................................................................................17
    B.    THE DEBTORS' PREPETITION FINANCING AGREEMENTS .........................................18
    C.    EVENTS LEADING TO BANKRUPTCY ........................................................................18
        1.    Physician Departures ....................................................................................18
        2.    Affiliation with HCA ......................................................................................19
        3.    Continued Liquidity Issues Facing the Debtors ..........................................19
    D.    THE DEBTORS' ASSETS AND LIABILITIES ................................................................20
        1.    Assets ..............................................................................................................21
        2.    Liabilities .......................................................................................................21
        3.    Litigation .......................................................................................................22

V. POST-BANKRUPTCY OPERATIONS AND SIGNIFICANT EVENTS ......................24

    A.    POST-BANKRUPTCY OPERATIONS ..........................................................................24
    B.    SIGNIFICANT PROCEEDINGS DURING THE CASE ......................................................24
        1.    First Day Motions and Hearing ...................................................................24
        2.    Employment of Professionals ........................................................................25
        3.    No Committee .................................................................................................25

VI. DESCRIPTION OF THE PLAN .....................................................................................25

A.  INTRODUCTION ...................................................................................................25
B.  OVERVIEW OF THE PLAN ....................................................................................25
C.  DESIGNATION OF CLAIMS AND INTERESTS ..........................................................26
D.  ESTIMATED SIZE OF ALLOWED CLAIMS IN CLASSES ...........................................27
E.  TREATMENT OF CLAIMS AND INTERESTS .............................................................27
    1.  Treatment of Unclassified Claims .........................................................27
    2.  Treatment of Classified Claims .............................................................28
F.  MEANS OF IMPLEMENTATION OF THE PLAN .........................................................30
    1.  Substantive Consolidation ......................................................................30
    2.  The Sadler Liquidation Trust .................................................................31
G.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ....................32
    1.  Assumption ...............................................................................................33
    2.  Rejection ...................................................................................................34
    3.  Indemnification of Directors, Officers and Employees ..........................34
H.  DISTRIBUTIONS ...................................................................................................34
    1.  Timing and Calculation of Amounts to Be Distributed ..........................34
    2.  Disbursing Agent .....................................................................................35
    3.  Distributions on Account of Claims Allowed After the Effective Date .....35
    4.  Delivery of Distributions and Undeliverable or Unclaimed Distributions.....35
I.  CAUSES OF ACTION .............................................................................................37
    A.  Retention of Causes of Action .................................................................37
J.  U.S. TRUSTEE QUARTERLY FEES .........................................................................39

VII.  FEASIBILITY AND RISKS ..............................................................................39

A.  BUSINESS RISKS ..................................................................................................39
B.  RISK OF NON-CONFIRMATION OF THE PLAN ........................................................40
C.  NON-OCCURRENCE OF EFFECTIVE DATE OF THE PLAN ........................................40
D.  RISK OF ACCOUNT RECEIVABLE SOFTNESS ........................................................41

VIII.  ALTERNATIVES TO PLAN AND LIQUIDATION ANALYSIS ...................41

A.  DISMISSAL ..........................................................................................................41
B.  CHAPTER 7 LIQUIDATION ...................................................................................42
C.  ALTERNATIVE PLAN ...........................................................................................42

IX.  CERTAIN UNITED STATES FEDERAL INCOME  TAX CONSEQUENCES OF THE PLAN ............42

A.  GENERAL ............................................................................................................43
B.  IRS CIRCULAR 230 DISCLOSURE .......................................................................44
C.  CONSEQUENCES TO HOLDERS OF CLAIMS ...........................................................44
    1.  Realization and Recognition of Gain or Loss in General ......................44
    2.  Accrued Interest ......................................................................................44
    3.  Withholding ..............................................................................................45
D.  TAX CONSEQUENCES TO THE DEBTORS ...............................................................45

X.  CONCLUSION .....................................................................................................46

## <u>APPENDIX OF EXHIBITS</u>

Exhibit 1      Chapter 11 Plan

Exhibit 2      Liquidation Analysis

Exhibit 3      Liquidating Trust Agreement

# I.

# INTRODUCTION

Sadler Clinic PLLC ("Sadler") and Montgomery County Management Company, LLC ("MCMC"), collectively referred to herein as the "Debtors" submit this Disclosure Statement ("Disclosure Statement") pursuant to Bankruptcy Code section 1125 for use in the solicitation of votes on the Chapter 11 Plan of Liquidation (the "Plan"), which is attached as Exhibit 1 to this Disclosure Statement.

This Disclosure Statement sets forth certain relevant information regarding the Debtors' prepetition operations and financial history. This Disclosure Statement also describes the Plan's terms and provisions, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. This Disclosure Statement also discusses the confirmation process and the voting procedures that holders of Claims must follow for their votes to be counted.

## A. Filing of the Debtors' Chapter 11 Cases

On June 15, 2012 (the "Petition Date"), the Debtors each filed voluntary petitions under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Sothern District of Texas, Houston Division (the "Bankruptcy Court"), initiating these bankruptcy proceedings.

## B. Purpose of the Disclosure Statement

The Debtors submit this Disclosure Statement in accordance with Bankruptcy Code section 1125 to solicit acceptances of the Plan from holders of certain Classes of Claims.[1] The only claimants whose acceptances of the Plan are sought are those whose Claims are "impaired" (as that term is defined in Bankruptcy Code section 1124) by the Plan and who are receiving distributions under the Plan.

The Debtors prepared this Disclosure Statement pursuant to Bankruptcy Code section 1125, which requires that a copy of the Plan, or a summary thereof, be submitted to all holders of Claims against, and Equity Interests in, the Debtors, along with a written disclosure statement containing adequate information about the Debtors of a kind, and in sufficient detail, as far as is reasonably practicable, that would enable a hypothetical, reasonable investor typical of claimants and Equity Interest Holders to make an informed judgment in exercising his or her right to vote on the Plan. A copy of the Plan is included as Exhibit 1 with the materials sent along with this Disclosure Statement.

The Bankruptcy Court approved the Disclosure Statement as containing adequate information to solicit votes on _____ ___, 2012. The Bankruptcy Code requires such approval, but this approval does not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan or as to the value or suitability of any consideration offered in the Plan. Such approval

---

[1] All capitalized terms not defined in the Disclosure Statement have the meaning defined in the Plan.

does indicate, however, that the Bankruptcy Court has determined that the Disclosure Statement meets the requirements of Bankruptcy Code section 1125 and contains adequate information to permit the claimants to make an informed judgment regarding acceptance or rejection of the Plan.

**THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN. THE MATERIAL CONTAINED HEREIN IS INTENDED SOLELY FOR THE USE OF THE DEBTORS' CREDITORS IN EVALUATING THE PLAN AND VOTING TO ACCEPT OR REJECT THE PLAN AND, ACCORDINGLY, MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN THE DETERMINATION OF HOW TO VOTE ON, OR WHETHER TO OBJECT TO, THE PLAN. THE DEBTORS' LIQUIDATION PURSUANT TO THE PLAN IS SUBJECT TO NUMEROUS CONDITIONS AND VARIABLES, AND THERE CAN BE NO ABSOLUTE ASSURANCE THAT THE PLAN WILL BE EFFECTUATED AS CONTEMPLATED.**

**THE DEBTORS BELIEVE THAT THE PLAN AND THE TREATMENT OF CLAIMS UNDER THE PLAN IS IN THE BEST INTERESTS OF CLAIMANTS. THE DEBTORS URGE YOU TO VOTE TO ACCEPT THE PLAN.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED ON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE PLAN SHOULD BE REVIEWED CAREFULLY.**

**C.     Hearing on Confirmation of the Plan**

The Bankruptcy Court has set _____ ___, 2012, at _____ o'clock __.m. Central Time, as the time and date for the hearing to determine whether the Plan has been accepted by the requisite number of claimants and whether the other requirements for confirmation of the Plan have been satisfied (the "Confirmation Hearing"). Holders of Claims against the Debtors may vote to accept or reject the Plan by completing and delivering the enclosed ballot to Diamond McCarthy LLP, 909 Fannin, Floor 15, Houston, Texas 77010, ATTN: Jeanette Scholl, on or before __:00 p.m. on _____ _____, 2012.

If the Plan is rejected by one or more impaired Classes of Claims, the Bankruptcy Court may still confirm the Plan, or a modification thereof, under Bankruptcy Code section 1129(b) (commonly referred to as a "cramdown") if it determines, among other things, that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting Class or Classes of Claims impaired under the Plan. In the event that the Plan is not confirmed for any reason, an alternative plan may be proposed by the Debtors, or if the Court permits, by another party. The procedures and requirements for voting on the Plan are described in more detail below. To the

extent insufficient votes are cast to support confirmation under Bankruptcy Code § 1129(a), the Debtors seek confirmation of the Plan under Bankruptcy Code § 1129(b).

**D.      Sources of Information**

Except as otherwise expressly indicated, the information set forth in this Disclosure Statement and the attached exhibits was provided by the Debtors and its management.  The financial information in the exhibits to this Disclosure Statement, including all projections and data, was provided by the Debtors or is based upon data generated by the Debtors or its professionals.

In addition, certain of the materials contained in this Disclosure Statement are taken directly from other readily accessible documents or are digests of other documents.  While the Debtors have made every effort to retain the meaning of such other documents or portions that have been summarized, they urge that any reliance on the contents of such other documents should depend on a thorough review of the documents themselves.  In the event of a discrepancy between this Disclosure Statement and the actual terms of a document, the actual terms of such document shall govern and apply.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified, and neither the delivery of this Disclosure Statement nor any exchange of rights made in connection with it shall, under any circumstances, create an implication that there has been no change in the facts set forth herein since the date of this Disclosure Statement.

No statements concerning the Debtors, the value of their assets, or the value of any benefit offered to the holder of a Claim in connection with the Plan should be relied on other than as set forth in this Disclosure Statement.  In arriving at a decision, parties should not rely on any representation or inducement made to secure their acceptance or rejection that is contrary to information contained in this Disclosure Statement, and any such additional representations or inducements should be immediately reported to counsel for the Debtors, Kyung S. Lee, Diamond McCarthy LLP, 909 Fannin, Floor 15, Houston, Texas 77010 (Telephone: 713-333-5100).

## II.

## EXPLANATION OF CHAPTER 11

### A.    Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code and may be used for the orderly liquidation of a debtor.  The commencement of a chapter 11 case creates an estate comprising all of the Debtors' legal and equitable interests in the assets as of the date the petition is filed.  Bankruptcy Code sections 1101, 1107 and 1108 provide that a chapter 11 debtor may continue to control the assets of its estate as "debtor-in-possession".

The filing of a chapter 11 petition also triggers the automatic stay under Bankruptcy Code section 362.  The automatic stay halts essentially all attempts to collect prepetition claims from the debtor or to otherwise interfere with the debtor's business or estate.

Formulation of a plan is the principal purpose of a chapter 11 case.  The plan sets forth the means for satisfying the claims of secured and unsecured creditors against, and equity interests in the debtor.

### B.    Plan of Reorganization or Liquidation

After the plan has been filed, the holders of claims against, or interests in, the debtor are permitted to vote on whether to accept the reject the plan.  Chapter 11 does not require that each holder of a claim against, or interest in, a debtor votes in favor of a plan in order for confirmation of the plan.  At a minimum, however, a plan must be accepted by a majority in number and two-thirds in amount of those claims actually voting from at least one class of claims impaired under the plan.

Classes of claims or interests that are not "impaired" under a plan are conclusively presumed to have accepted the plan, and therefore are not entitled to vote.  A class is "impaired" if the plan modifies the legal, equitable or contractual rights attaching to the claims or interests of that class.  Modification for purposes of impairment does not include curing defaults and reinstating maturity or payment in full in cash.  Classes of claims or interests that receive or retain no property under a plan of reorganization are conclusively presumed to have rejected the plan, and therefore not entitled to vote.

Even if all classes of claims and interests accept a plan the Bankruptcy Court may nonetheless still deny confirmation.  Bankruptcy Code section 1129 sets forth the requirements for confirmation and, among other things, requires that a plan be in the "best interests" of impaired and dissenting creditors and interest holders and that the plan be feasible.  The "best interests" test generally requires that the value of the consideration distributed to impaired and dissenting creditors and interest holders under a plan may not be less than those parties would receive if the debtor were liquidated under a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code.

The Bankruptcy Court may confirm a plan of reorganization or liquidation even though fewer than all of the classes of impaired claims and interests accept it.  The Bankruptcy Court may do so under the "cramdown" provisions of Bankruptcy Code section 1129(b).  In order for a plan to be confirmed under the cramdown provisions, despite the rejection of a class of impaired claims or interests, the proponent of the plan must show, among other things, that the plan does not discriminate unfairly and that it is fair and equitable with respect to each impaired class of claims or interests that has not accepted the plan.

The Bankruptcy Court must further find that the economic terms of the particular plan meet the specific requirements of Bankruptcy Code section 1129(b) with respect to the subject objecting class.  If the proponent of the plan proposes to seek confirmation of the plan under the provisions of Bankruptcy Code section 1129(b), the proponent must also meet all applicable requirements of Bankruptcy Code section 1129(a) (except section 1129(a)(8)).  Those requirements include the requirements that (i) the plan comply with applicable Bankruptcy Code provisions and other applicable law, (ii) that the plan be proposed in good faith, and (iii) that at least one impaired class of creditors or interest holders has voted to accept the plan.

## III.

## VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS

### A.      Ballots and Voting Deadline

A ballot for voting to accept or reject the Plan is enclosed with this Disclosure Statement, and has been mailed to claimants (or their authorized representative) entitled to vote.  After carefully reviewing the Disclosure Statement, including all exhibits, each claimant entitled to vote should indicate its vote on the enclosed ballot.  All claimants entitled to vote must (i) carefully review the ballot and instructions thereon, (ii) execute the ballot, and (iii) return it to the address indicated on the ballot by the deadline (the "Voting Deadline") for the ballot to be considered.

The Bankruptcy Court has directed that, in order to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received no later than _____ ___, 2012, at the following address:

Diamond McCarthy LLP
ATTN: Jeanette Scholl
909 Fannin, Floor 15
Houston, Texas 77010
Fax: 713.333.5195

**BALLOTS MUST BE RECEIVED AT THE ABOVE ADDRESS NO LATER THAN _____ ___, 2012.**

**B.      Claimants Entitled to Vote**

Any claimant of the Debtors whose Claim is impaired under the Plan is entitled to vote if either (i) the Debtors have scheduled the claimant's Claim and such scheduled Claim is not identified as disputed, contingent or unliquidated, or (ii) the claimant has filed a proof of Claim on or before the deadline set by the Bankruptcy Court for such filings.  Any holder of a Claim or interest as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court (on motion by a party whose Claim or interest is subject to an objection or the Debtors) temporarily allows the Claim in an amount that it deems proper for the purpose of accepting or rejecting the Plan.  Such motion must be heard and determined by the Bankruptcy Court before the first date set by the Bankruptcy Court for the Confirmation Hearing of the Plan.  In addition, a claimant's vote may be disregarded if the Bankruptcy Court determines that the claimant's acceptance or rejection was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

**C.      Bar Date for Filing Proofs of Claim**

The Bankruptcy Court established a bar date for filing proofs of Claim or Equity Interests in these chapter 11 cases of _____ ____, 2012, for non governmental units (the "<u>General Bar Date</u>"), and _____ __, 2012 for governmental units (the "<u>Governmental Unit Bar Date</u>").

**D.      Definition of Impairment**

Under Bankruptcy Code section 1124, a class of claims or equity interests is impaired under a plan of reorganization/liquidation unless, with respect to each claim or equity interest of such class, the plan:

1.      leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or interest;

2.      notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to receive accelerated payment of his claim or interest after the occurrence of a default;

  (a)      cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Bankruptcy Code section 365(b)(2);

  (b)      reinstates the maturity of such claim or interest as it existed before the default;

  (c)      compensates the holder of such claim or interest for damages incurred as a result of reasonable reliance on such contractual provision or applicable law; and

  (d)      if such claim or such interest arises from any failure to perform a nonmonetary obligation, other that a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A),

compensates the holder of such claim or such interest (other than the Debtors or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(e)     does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or interest.

## E.     Classes Impaired Under the Plan

All Classes of Claims and Equity Interests, except holders of claims in Classes 1 and 2, are impaired under the Plan.  Therefore, all holders of Allowed Claims in Classes 3, 4 and 5 are eligible, subject to the limitations set forth above, to vote to accept or reject the Plan.  Class 6 receives nothing under the Plan and is deemed to reject the Plan.

## F.     Vote Required for Class Acceptance

The Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the claims of that class that actually cast ballots for acceptance or rejection of the plan; that is, acceptance takes place only if creditors holding claims at least two-thirds in amount of the total amount of claims and more than one-half in number of the creditors actually voting cast their ballots in favor of acceptance.

## G.     Information on Voting and Ballots

### 1.     Transmission of Ballots to Creditors

Except as otherwise provided in the Order Approving Debtors' Disclosure Statement under 11 U.S.C. § 1125, entered on _____ ___, 2012 [DE #__], ballots are being forwarded to all claimants and Equity Interests.

### 2.     Ballot Tabulation Procedures

For purposes of voting on the Plan, the amount and classification of a Claim and the procedures that will be used to tabulate acceptances and rejections of the Plan are as follows:

(a)     If no proof of Claim has been timely filed, the voted amount of a Claim shall be equal to the amount listed for the particular Claim in the Schedules of Assets and Liabilities, as and if amended, to the extent such Claim is not listed as contingent, unliquidated or disputed, and the Claim shall be placed in the appropriate Class, based on the Debtors' records, and consistent with the Schedules of Assets and Liabilities, the Claims registry of the Clerk of the Bankruptcy Court (the "Clerk") and the respective registry of holders of interests;

(b)     If a proof of Claim has been timely filed, and has not been objected to before the expiration of the Voting Deadline, the voted amount of that Claim shall be as specified in the proof of Claim filed with the Clerk;

(c)     Subject to subparagraph (d) below, a Claim that is the subject of an objection filed before the Voting Deadline shall be disallowed for voting purposes, except to the extent and in the manner that the Debtors indicates in its objection that the Claim should be allowed for voting or other purposes;

(d)     If a Claim has been estimated or otherwise allowed for voting purposes by order of the Bankruptcy Court, the voted amount and classification shall be that set by the Bankruptcy Court;

(e)     If a claimant or its authorized representative did not use the Ballot, as applicable, provided by the Debtors, or the Official Ballot Form authorized under the Federal Rules of Bankruptcy Procedure, such Ballot will not be counted;

(f)     If the Ballot is not received by the Debtors on or before the Voting Deadline at the place fixed by the Bankruptcy Court, the Ballot will not be counted;

(g)     If the Ballot is not signed by the claimant or its authorized representative, the Ballot will not be counted;

(h)     If the individual or institution casting the Ballot (whether directly or as a representative) was not the holder of a Claim on the Voting Record Date (as that term is defined below), the Ballot will not be counted;

(i)     If no Ballots are received on or before the Voting Deadline with respect to a particular class of Claims, then the Debtors may ask the Bankruptcy Court to deem such class of Claims as accepting the Plan;

(j)     Whenever a claimant (or its authorized representative) submits more than one Ballot voting the same Claim(s) before the applicable deadline for submission of Ballots, except as otherwise directed by the Bankruptcy Court after notice and a hearing, the last such Ballot shall be deemed to reflect the voter's intent and shall supersede any prior Ballots.

**3.      Execution of Ballots by Representatives**

If a Ballot is signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations, or others acting in a fiduciary or representative capacity, such persons must indicate their capacity when signing and, at the Debtors' request, must submit proper evidence satisfactory to the Debtors of their authority to so act.

**4.      Waivers of Defects and Other Irregularities Regarding Ballots**

Unless otherwise directed by the Bankruptcy Court, all questions concerning the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Debtors in their sole discretion, whose determination will be final and

binding.  The Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of either the Debtors or their counsel, be unlawful. The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots, nor will any of them incur any liability for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until any irregularities have been cured or waived.

5.  **Withdrawal of Ballots and Revocation**

Any holder of a Claim (or its authorized representative) in an impaired Class who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to counsel for the Debtors at any time before the Voting Deadline.

To be valid, a notice of withdrawal must: (i) contain the description of the Claims to which it relates and the aggregate principal amount represented by such Claims; (ii) be signed by the claimant (or its authorized representative) in the same manner as the Ballot; and (iii) be received by counsel for the Debtors in a timely manner at the addresses set forth herein.  The Debtors expressly reserves the absolute right to contest the validity of any such withdrawals of Ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of Ballots that are not received in a timely manner by the Debtors will not be effective to withdraw a previously furnished Ballot.

Any claimant (or its authorized representative) who has previously submitted a properly completed Ballot to counsel for the Debtors before the Voting Deadline may revoke such Ballot and change its vote by submitting to counsel for the Debtors before the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan.

H.  **Confirmation of the Plan**

1.  **Solicitation of Acceptances**

The Debtors are soliciting your vote for acceptance of the Plan.  The Debtors will bear the cost of any solicitation.  No other additional compensation shall be received by any party for any solicitation other than as disclosed to the Bankruptcy Court.

**NO REPRESENTATIONS OR ASSURANCES, IF ANY, CONCERNING THE DEBTORS OR THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY**

**PERSON TO SECURE YOUR VOTE OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED ON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS. THIS IS A SOLICITATION SOLELY BY THE DEBTORS, AND IS NOT A SOLICITATION BY ANY SHAREHOLDER, ATTORNEY OR ACCOUNTANT FOR THE DEBTORS. THE REPRESENTATIONS, IF ANY, MADE HEREIN ARE THOSE OF THE DEBTORS AND NOT OF SUCH SHAREHOLDERS, ATTORNEYS OR ACCOUNTANTS, EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY INDICATED.**

The solicitation of votes on the Plan is governed by Bankruptcy Code section 1125(b). Violation of Bankruptcy Code section 1125(b) may result in sanctions by the Bankruptcy Court, including disallowance of any improperly solicited vote.

**2.      Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of Bankruptcy Code section 1129 have been satisfied, in which event the Bankruptcy Court shall enter an Order confirming the Plan. For the Plan to be confirmed, Bankruptcy Code section 1129 requires that:

(a)      The Plan complies with the applicable provisions of the Bankruptcy Code;

(b)      The Debtors complies with the applicable provisions of the Bankruptcy Code;

(c)      The Plan be proposed in good faith and not by any means forbidden by law;

(d)      Any payment or distribution made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expense in connection with the Plan be disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment be subject to the approval of the Bankruptcy Court as reasonable;

(e)      The Debtors disclose the identity and affiliation of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan; the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors and Equity Interest holders and with public policy; and the Debtors disclose the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider;

(f)     Any government regulatory commission with jurisdiction (after confirmation of the Plan) over the rates of the Debtors have approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval;

(g)     With respect to each impaired Class of Claims or Equity Interests, either each holder of a Claim or Equity Interest of the Class has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Equity Interest of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code.  If Bankruptcy Code section 1111(b)(2) applies to the Claims of a Class, each holder of a Claim of that Class will receive or retain under the Plan on account of that Claim property of a value, as of the Effective Date, that is not less than the value of that holder's interest in the Debtors' interest in the asset that secures that Claim;

(h)     Each Class of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan;

(i)     Except to the extent that the holder of a particular Administrative Claim or Priority Claim has agreed to a different treatment of its Claim or as otherwise provided by the Bankruptcy Code, the Plan provides that Administrative Claims and Priority Claims shall be paid in full on the Effective Date or the Allowed Date;

(j)     If a Class of Claims is impaired under the Plan, at least one such Class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that Class; and

(k)     Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Debtors believe that the Plan satisfies all of the statutory requirements of the Bankruptcy Code for confirmation and that the Plan is proposed in good faith.  The Debtors believe it has complied, or will have complied, with all the requirements of the Bankruptcy Code governing confirmation of the Plan.

### 3.     Acceptances Necessary to Confirm the Plan

Voting on the Plan by each holder of a Claim (or its authorized representative) is important.  Chapter 11 of the Bankruptcy Code does not require that each holder of a Claim vote in favor of the Plan in order for the Court to confirm the Plan.  Generally, to be confirmed under the acceptance provisions of Bankruptcy Code section 1126(a), the Plan must be accepted by each Class of Claims that is impaired under the Plan by parties holding at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class actually

voting in connection with the Plan. Even if all Classes of Claims accept the Plan, the Bankruptcy Court may refuse to confirm the Plan. In the event that this Plan is not confirmed for any reason, an alternative plan may be proposed by the Debtors, or if the Bankruptcy Court permits, by any other party.

4.      **Cramdown**

In the event that any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no Class receives more than it is legally entitled to receive for its Claims or Equity Interests. "Fair and equitable" has different meanings for holders of secured and unsecured Claims and Equity Interests.

With respect to a Secured Claim, "fair and equitable" means either (i) the impaired Secured Creditor retains its liens to the extent of its Allowed Claim and receives deferred cash payments at least equal to the allowed amount of its Claims with a present value as of the Effective Date of the Plan at least equal to the value of such Creditor's interest in the property securing its liens, (ii) property subject to the lien of the impaired Secured Creditor is sold free and clear of that lien, with that lien attaching to the proceeds of sale, and such lien proceeds must be treated in accordance with clauses (i) and (iii) hereof; or (iii) the impaired Secured Creditor realizes the "indubitable equivalent" of its Claim under the Plan.

With respect to a General Unsecured Claim, "fair and equitable" means either (i) each impaired Creditor receives or retains property of a value equal to the amount of its Allowed Claim or (ii) the holders of Claims and Equity Interests that are junior to the Claims of the dissenting Class will not receive any property under the Plan.

With respect to Equity Interests, "fair and equitable" means either (i) each impaired Equity Interest receives or retains, on account of that Equity Interest, property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which the holder is entitled, any fixed redemption price to which the holder is entitled, or the value of the Equity Interest; or (ii) the holder of any Equity Interest that is junior to the Equity Interest of that Class will not receive or retain under the Plan, on account of that junior Equity Interest, any property.

In the event at least one Class of impaired Claims or Equity Interests rejects or is deemed to have rejected the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired Class of Claims or Equity Interests.

The Debtors believe that the Plan does not discriminate unfairly and is fair and equitable with respect to each impaired Class of Claims and Equity Interests and is confirmable. The Debtors request, pursuant to Bankruptcy Code section 1129(b)(1), that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of section 1129(a)(8) may not be met and their intent to pursue a cramdown if necessary to confirm the Plan.

# IV.

## BACKGROUND OF THE DEBTORS

**A.     Debtors' Business**

The Debtors operated a multi specialty physician clinic known as Sadler Clinic ("Sadler Clinic").  Sadler Clinic was founded in 1958 by Dr. Deane Sadler, Dr. Irving Watson and Dr. Walter Wilkerson.  Sadler Clinic grew steadily through the years.  At its peak in 2010, Sadler Clinic had 13 locations, over 100 providers, and a staff of more than 600 healthcare professionals.  In 2010, the Debtors' annual revenue exceeded $250,000,000.

**1.     Corporate Structure**

Sadler is a Texas professional limited liability company.  MCMC is a Texas limited liability company and a wholly-owned subsidiary of Sadler.  Sadler and MCMC are parties to a certain Management Services Agreement, dated as of January 1, 2001 (the "Management Services Agreement").  Under the Management Services Agreement, Sadler is responsible for, among other things, (i) providing professional medical services to patients, (ii) monitoring the quality of medical care at Sadler Clinic, and (iii) hiring, supervising and terminating physician employees.  MCMC, on the other hand, is responsible for, among other things, (i) managing all day-to-day functions of Sadler Clinic and (ii) relieving Sadler of administrative, accounting, personnel and business aspects of Sadler's medical practice.

The physicians at Sadler Clinic provided patient care and billed either the patient or a third party payer. With its administrative personnel, MCMC monetized the receivables and then paid the physicians, staff, vendors, and real estate lessors.

Upon the termination of the Management Services Agreement by either Sadler or MCMC or upon expiration of the agreement, Sadler agreed to, among other things, assume all debts and contracts, payables and leases which are obligations of MCMC related to MCMC's performance under the Management Services Agreement.

**2.     Physician Employees**

Sadler required each physician employee to enter into an employment agreement, whereby the physician agreed not to, for a period of either twelve (12) or eighteen (18) months following termination of employment by Sadler Clinic, directly or indirectly practice medicine or surgery, or assist some other person or entity to practice medicine or surgery, or form or own an interest in a business that practices medicine or surgery, within the geographic limit of the particular doctor's noncompete area (the "Non-Compete Provisions").   Sadler's creditors, including its primary bank, Woodforest (defined below) and, later, HCA (defined below) required Sadler to have in place with each physician a contract with the Non-Compete Provisions.  The revenue generated from treating patients at Sadler was, until recently, the primary asset of the Debtors.

Sadler compensated its physicians under an income distribution plan (the "IDP"). Pursuant to the IDP, the physician employees received compensation based on one of four different models including: a model that is tied to the individual physician's performance and the overall performance of the clinic; a salary model; a per-diem model and an hourly model.

## B.      The Debtors' Prepetition Financing Agreements

Prior to February 17, 2012, MCMC borrowed monies from Woodforest National Bank ("Woodforest") under a loan and security agreement (the "Loan") to finance its operations. In addition, the Debtors also financed their business through vendor and equipment financing.

As described below, the Debtors began experiencing financial issues after the departure of a significant number of its physicians in 2010. The Debtors' revenues decreased immediately and over the following months, collections decreased. The Debtors received some special income including income from asset sales and an insurance recovery, during the months following the physician departures that helped offset some of these losses. The cost of running Salder Clinic, however, remained at pre-departure levels. Soon, the creditors could not be paid timely and a back log of accounts payable built up. The Debtors tried to manage vendors on a case by case basis.

In an effort to solve the financial difficulties facing the Debtors in 2010, the Debtors explored various opportunities for restructuring their business and operations. The Debtors had discussions with Hospital Corporation of America (together with its affiliates, "HCA"), Memorial Hermann, St. Luke's Hospital, and other health providers. Sadler decided that a concept discussed with HCA made the most sense. Sadler had been in negotiations with HCA since 2010 and renewed their efforts in earnest to 2011 to do a sale-lease back and a management service agreement. Nevertheless, the transaction with HCA did not close until February 2012.

On or about February, 17, 2012, the Debtors sold the majority of their assets to HCA for approximately $21.3 million pursuant to the Asset Purchase Agreement (defined below). On the same date, the Debtors entered into the Affiliation Agreement (defined below) whereby HCA initially advanced the Debtors approximately $3.4 million. Of the approximately $24.7 million in proceeds from the Asset Purchase Agreement and the Affiliation Agreement, $11.9 million were used to pay down the Loan. The remaining proceeds were used to pay down all vendors that had any liens on the Debtors' assets and to catch up past due pay and real estate leases.

## C.      Events Leading to Bankruptcy

### 1.      Physician Departures

In April 2010, twenty-four physicians, representing approximately twenty percent of Debtors' total physician employees, resigned from and filed suit against Sadler, seeking to invalidate their covenants not to compete (together with later departing physicians, the "Departing Physicians"). After the Departing Physicians left Sadler Clinic, the Debtors' revenue decreased substantially. At the same time, the Debtors were unable to reduce their expenses proportionally. The Debtors sought to enforce the non-compete provisions in the Departing Physician's employment agreements. The Debtors, however, received unfavorable rulings,

allowing other physicians to leave Sadler Clinic and establish competing practices.   Some of the adverse rulings are on appeal.

In an effort to correct the revenue loss, Sadler hired new physicians to replace the Departing Physicians.  Nevertheless, many of the new physicians were not able to generate the revenues the Debtors needed to cover the new physicians' salaries, costs and expenses.

### 2.        Affiliation with HCA

To address their financial and operations problems, the Debtors sought a strategic partner. During 2010, the Debtors began negotiating with HCA.  After arduous negotiations, Sadler entered into a sale-lease back transaction and an affiliation agreement with HCA.

On or about February 17, 2012, the Debtors and HCAPS Conroe Affiliation, Inc. ("HCAPS"), an affiliate of HCA, entered into (i) an Asset Purchase Agreement, dated as of February 17, 2012 (the "Asset Purchase Agreement") and (ii) an Affiliation Agreement, dated as of February 17, 2012 (the "Affiliation Agreement").   The Asset Purchase Agreement provided for, among other things, the sale of certain of the Debtors' equipment, furniture, fixtures and software to HCA for $21,296,726.  The Affiliation Agreement provided for, among other things, (i) a lease of the equipment, furniture, fixtures and software sold under the Asset Purchase Agreement back to the Debtors, and (ii) a revenue participation whereby HCA agreed to make capital advances to Sadler in the aggregate amount of $8,927,023 in exchange for monthly payments equal to 3.5% of the Debtors' revenue for the next 40 years.

Of the $8,927,023, HCA advanced $3,412,110.22 on the effective date of the Affiliation Agreement.  The Debtors used the monies to pay off outstanding balances owed to certain of the Debtors' creditors.   HCA never advanced the remaining $5,514,912.78.   The Affiliation Agreement required the Debtors to pay all the vendors current on a go forward basis.  This requirement resulted in new liquidity problems for the Debtors.

### 3.        Continued Liquidity Issues Facing the Debtors

The Asset Purchase Agreement and Affiliation Agreement did not solve the Debtors' problems.  Insufficient funds precluded the Debtors from right sizing its balance sheet.  The Debtors faced almost immediate defaults under key obligations after it closed the February 2012 transactions with HCA.

During March 2012, the Debtors requested funds from HCA under the Affiliation Agreement to cure certain defaults.  HCA did not advance the requested funds.

During April 2012, based on a recommendation of the advisory board, HCA sent a team of professionals to the Debtors' headquarters to analyze the Debtors' finances and operations and to advise the Debtors on a turnaround strategy.  HCA began interviewing the Debtors' physicians to determine which physicians should be retained by the reorganized Sadler Clinic.   HCA interviewed physicians for a few days and then abruptly cancelled future interviews, without advance notice to the Debtors.  Certain physicians began looking for positions elsewhere.  Some made comments to staff that undermined their continued belief in the Debtors' survival.  HCA

never gave a formal recommendation or report in connection with the April 2012 analysis and interviews.

The Debtors made additional funding requests to HCA under the Affiliation Agreement. HCA rejected all these funding requests.   Because HCA had a lien on the Debtors' accounts receivable, the Debtors lacked unencumbered assets to get temporary financing from another source.

With no alternative financing source, the Debtors had to operate exclusively on cash realized from collection of accounts receivable.   These funds proved insufficient to sustain operations.

At the beginning of May 2012, the Debtors began defaulting on numerous obligations. During this time, the Debtors prepared an operational and financial restructuring plan.   HCA, whose support was critical to implementing the plan, was unwilling to support the restructuring plan.   In May 2012, HCA took the position that Debtors had not used the correct form attached to the Affiliation Agreement to request the funds and, therefore, the funds would not be disbursed. By waiting several weeks before taking this position, HCA was able to point to certain monetary and nonmonetary defaults by Debtors as an excuse to not further perform under the Affiliation Agreement.   As a result, Debtors found themselves in continuing defaults under various obligations.

In an effort to develop an operating chapter 11 model, the Debtors prepared operational and financial restructuring plans.   Pursuant to one of the plans, the Debtors terminated certain low-producing doctors, consolidated from 11 locations to four locations and decreased the amount of equipment leased from HCA.   The Debtors considered implementing its restructuring plan through a chapter 11 plan of reorganization which would cap the damage claims under long-term leases.

HCA's support was critical to the success of the reorganization as HCA owned a significant part of the Debtors' equipment and HCA was the exclusive source of funding available to the Debtors.   The Debtors presented their plan to HCA on or about May 9, 2012. HCA subsequently informed the Debtors that they were unwilling to support the Debtors' restructuring plan.   On May 30, 2012, HCA sent a letter to the Debtors terminating the Affiliation Agreement.

The Debtors are now preparing for an orderly liquidation.   Over the last several weeks, the Debtors have terminated nearly all of their physician employees and staff.   The Debtors are also working with their former physician employees and landlords to assign leases to the physicians and reduce the lease damages against the Debtors.   The Debtors are also working with HCA to protect HCA's equipment and re-deploy the equipment to the Debtors' former physicians.   Finally, the Debtors are working on formulating a long-term plan to maintain medical records and address requests for medical records from doctors and patients.

**D.**      **The Debtors' Assets and Liabilities**

The Debtors' assets and liabilities on the Petition Date are detailed in the Schedules [DE

#__] and Statements of Financial Affairs [DE # __] filed in the Chapter 11 Cases. Below is a summary of these assets and liabilities.

>        1.        **Assets**

As a result of the Asset Purchase Agreement, the Debtors sold the majority of their assets - other than accounts receivable - to HCA. As of the Petition Date, the Debtors' assets include (i) cash on hand in the amount of approximately $415,000 held in a bank accounts on behalf of the Debtors; (ii) accounts receivable from the prepetition operation of the Debtors' business in the total net collectable amount of approximately $6.9 million (the "AR Assets"); (iii) inventory with a book value of $278,000; (iv) equipment with a net book value of $428,000; (v) investments in the Sadler's Supplemental Retirement Plan (the "SERP") valued at $780,000; and (vi) prepaid expenses, including professional fee retainers of $350,000. Estimated liquidation values for the Debtors' assets are provided in the Liquidation Analysis attached as Exhibit 2 to this disclosure statement. HCA asserts a lien on the AR Assets. Other creditors may assert liens on certain of the equipment and inventory.

As reflected on this summary, the majority of the AR Assets are owed by commercial health insurance companies (Aetna, Blue Cross and Blue Shield, Cigna, etc.) and governmental programs (Medicare, Medicaid, etc.). Of the approximately $6.9 million in net receivables, the Debtors estimate a collection rate of 96% based on the aging these receivables and past collection experience. A variety of factors that impact the collectability of these receivables is discussed in Section VII of this Disclosure Statement.

The Debtors' books also reflect an additional $13 million in "reserved" receivables that are unlikely to be collectable. These reserved receivables include accounting entries resulting from standard medical billing practices requiring medical providers like the Debtors to book certain receivables at the highest reimbursable amount, even when the contracts with many thirds party payers provide significant discounts off the highest reimbursable amount to these payers. For example, the highest reimbursable amount for a specific procedure may be $100, but the Debtors' contract with a specific insurance company may provide a 30% discount, resulting in the Debtors billing $70 for the procedure. In this example, the Debtors' books would reflect a gross receivable of $100, a reserved amount of $30 to reflect the discount and a net collectable receivable of $70. As a result of this standard practice, as of the Petition Date, the Debtors' books reflect $20 million in gross receivables, $13 million of which is reserved and not collectable, with $6.9 million in net receivables.

The AR Assets represent the Debtors' primary means to fund the distributions and recoveries provided by the Plan. The Debtors' account receivable collection team coordinates with NextGen and ACS, the Debtors' outside medical receivable collection agents.

>        2.        **Liabilities**

As of the Petition Date, the Debtors' primary liabilities include (a) a disputed secured claim by HCA in the amount of approximately $3.378 million, (b) approximately $1.7 million in priority unsecured claims that include, among other things, certain unpaid employee claims, and (c) approximately $31 million in general unsecured claims that include, among other claims (i)

vendor claims, (ii) real estate and equipment lessor claims, (iii) damages claims, and (iv) claims against the SERP.

 3.      **Litigation**

        As of the Petition Date, the Debtors are parties to the following pending litigation matters:

                a)      *Greater Houston Radiation Oncology, P.A., et al. v. Sadler Clinic Association, P.A.*, Case No. 09-11-00460, pending in the Ninth District Court of Appeals of Texas.   Greater Houston Radiation Oncology, P.A., Oncology Reimbursement Services, L.P., and Oncology Management Services, L.P., appealed the Final Judgment that awarded Sadler against Appellants principal damages in the amount of $807,935 and prejudgment interest in the amount of $25,140.99.   In the event the appeal fails, Sadler will have a judgment against Appellants for fees incurred in an appeal to the court of appeals in the amount of $75,000 and to the Texas Supreme Court in the amount of $50,000.   By way of cross-appeal, Sadler seeks to set aside the $62,000 awarded to Oncology Reimbursement Services, L.P. against Sadler in the Final Judgment.    Oral argument was held on March 29, 2012, and a decision is expected at any time.

                b)      *Sadler Clinic Association, P.A. v. Nora C. Hart, et al.*, Case Nos. 09-12-00082-CV and 09-12-00086-CV, pending in the Ninth District Court of Appeals of Texas.   Sadler sued to enforce covenants not to compete against departed physicians Hart, Alam, Soares, Patel and Wang, including buyout amounts of approximately $1.6 million by which the doctors can pay Sadler to compete against Sadler in the territory of the noncompete.   The trial court by summary judgment declared the covenants unenforceable because the agreements allegedly fail to include "a reasonable buyout clause."   The trial court then severed the summary judgment into a new cause so that it could become final and appealable. The trial court also denied Sadler injunctive relief in the original suit. Sadler pursued both an accelerated appeal of the denial of injunctive relief in the original cause, and a regular appeal from the summary judgment that became final in the severed cause.

                In addition to the foregoing, Ajay Kwatra, M.D. intervened seeking a declaration that his covenant not to compete is unenforceable.   The trial court granted Sadler's motion to compel arbitration and otherwise stayed the remainder of Kwatra's claims.

                c)      *Sadler Clinic, PLLC v. Shilpa Vaidya, M.D.*, Cause No. 12-04-04622-CV, pending in the 9th Judicial District Court of Montgomery County, Texas.   Sadler in April 2012 filed an original petition and application for injunctive relief against Dr. Vaidya, a former Sadler physician who left the clinic and began practicing in violation of her noncompete agreement in early 2012. Vaidya answered on May 6, 2012.   No further action has been taken in the lawsuit. No deadlines are pending.

d) *LSAC Woodlands, L.P. v. Montgomery County Management Company, LLC*, Cause No. 12-03-02792-CV, pending in the 410th District Court of Montgomery County, Texas. Plaintiff was MCMC's landlord at the building located at 17191 St. Luke's Way, The Woodlands, Texas. The landlord seeks to recover past due rents and an injunction to (i) compel MCMC's sub-tenant on the lease to make payments to LSAC Woodlands rather than to MCMC, (ii) seize rents collected from sub-tenant that might be impressed with a constructive trust, and (iii) foreclose the landlord's lien on property of MCMC and its sub-tenants located on the premises. MCMC has filed a general denial, but has not answered the landlord's discovery requests. The landlord has filed a motion to compel, which is set on the court's submission docket (to be decided without hearing) on June 25, 2012.

### 4. Handling of Medical Records

As healthcare providers, the Debtors maintained medical records for the patients treated at the Sadler Clinic. The Debtors currently have possession of over 300,000 physical paper medical records from the prepetition operation of the Sadler Clinic. In addition, there are over one-million individual electronic health records stored on the Debtors' servers maintained by Optimum Computer Solutions ("OCS"). As part of the Debtors' liquidation through the Plan, the Debtors will provide for the orderly and transfer of the medical records.

The Debtors contract with Healthport, one of the nation's largest medical record management companies, to process and fulfill medical record requests and maintain compliance related to releasing medical information to requesters. Healthport's staff is responsible for validating and processing all the Debtors' pending and incoming patient requests, and fulfilling them in a legally compliant manner. The Debtors are consolidating the location of all paper medical records to their Conroe, Texas warehouse space, where on-site Healthport employees will handle record transfers.

Electronic medical records are maintained through NextGen Healthcare, a provider of EHR (Electronic Health Records) for physician practices and other healthcare organizations. Physicians who have entered into a formal Business Associate Agreement with the Debtors (addressing HIPAA privacy issues), continue to have this information available to them through OCS, the Debtors' third-party IT administrator. Individual physicians are arranging for transfers of their specific patient-related EHR information directly through OCS to individual NextGen licenses. All other information will be maintained on a server for Healthport's access as required.

Certain health care providers that have hired former Sadler physicians have expressed an interest in entering into a Medical Records Transfer Agreement to provide for transferring select medical records with respect to those former Sadler physicians. The Debtor anticipates implementing these agreements, provided they meet all legal and regulatory requirements, and transferring a significant amount of the medical records to other health care providers.

Sadler has also offered Medical Records Transfer and Custody Agreements with those physicians/entities interesting in serving as Records Custodians for specific patients associated with their practices.

In addition to the above measures, Sadler is actively seeking a long-term Records Custodian for remaining patient records, to ensure compliance with the Texas Department of State Health Services Retention Schedule for Medical Records (Guidelines for Doctors' offices and Clinics).

## V.

## POST-BANKRUPTCY OPERATIONS AND SIGNIFICANT EVENTS

### A.      Post-Bankruptcy Operations

Since the Petition Date, the Debtors have continued to manage its properties for the benefit of creditors focusing primarily on the collection of and monetization of the accounts receivable, facilitating physician and staff transition to new clinic and medical providers and developing a long term plan to maintain medical records in accordance with applicable law.

### B.      Significant Proceedings During the Case

### 1.      First Day Motions and Hearing

On the Petition Date, the Debtors filed the following emergency motions (the "First Day Motions"):

(a) Emergency Motion For Order (I) Authorizing Payment of Employee Obligations and (II) Granting Related Relief (the "Wages Motion") [DE #9];

(b) Emergency Motion for Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to Bankruptcy Code § 363, (II) Granting Adequate Protection Pursuant to § 363; and (III) Setting Final Hearing Pursuant to Bankruptcy Rule 4001 (the "Cash Collateral Motion") [DE #8];

(c) Emergency Motion for Order under 11 U.S.C. §§ 105, 345, 363, 364, 1107 and 1108 Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management System (the "Bank Account Motion") [DE #7];

(d) Emergency Motion for Order (I) Authorizing Debtors to Furnish Cash Deposit For Adequate Assurance of Utility Services Under 11 U.S.C. § 366 and (III) Prohibiting Companies From Altering, Refusing or Discontinuing Services

[DE #6]; and

    (e)   Emergency Motion for Entry of an Order Pursuant to Federal Rule of Bankruptcy Procedure 1015(b) Directing Joint Administration of Related Chapter 11 Cases [DE #3].

The Bankruptcy Court set a hearing on the First Day Motions for Tuesday, June 19, 2012, at 9:30 a.m. (Central).

    **2.**    **Employment of Professionals**

The Debtors filed applications to retain the following professionals to provide services to the Debtors during these chapter 11 cases (the "<u>Professional Applications</u>"):

    (a)   Diamond McCarthy LLP to represent the Debtors as general bankruptcy counsel [DE #__];

    (b)   Conway MacKenzie, Inc. to serve as the Debtors' financial advisors [DE #___]; and

    (c)   Strasburger & Price, LLP to serve as the Debtors' special counsel on specific matters [DE#__].

    **3.**    **No Committee**

No official committees have been appointed in these chapter 11 cases.

# VI.

# DESCRIPTION OF THE PLAN

## A.    Introduction

A summary of the principal provisions of the Plan and the treatment of Classes of Allowed Claims and Equity Interests is set out below.  The summary is entirely qualified by the Plan.  This Disclosure Statement is only a summary of the terms of the Plan; it is the Plan and not the Disclosure Statement that governs the rights and obligations of the parties.

## B.    Overview of the Plan

The Plan provides for the complete liquidation of the Debtors through transfer of all of the Debtors' Assets, consisting primarily of prepetition accounts receivable and litigation claims, to a liquidation trust.  The trustee of this trust will collect the Debtors' accounts receive and monetize all other assets for the benefit of the Debtors' Creditors with Allowed Claims.  The Plan consolidates the Debtors, and all of their assets and creditor claims, into a single trust.  This consolidation disregards the separateness of the Debtors, and treats all creditors as being a

creditor of both Debtors.

The trustee will hire a team of the Debtors' employees and medical receivable collection professionals to maximize the collection of the Debtors' accounts receivable.  These receivables include Medicare, Medicaid and other receivables subject to strict regulations and procedures for collection.  The Debtors' expert collection team is uniquely qualified to quickly and successfully monetize these receivables.  Attached as Exhibit 2 is the Liquidation Analysis.  In the column "Chapter 11" the Debtors have summarized the recoveries under the Plan, as opposed to recoveries under chapter 7 of the Bankruptcy Code.

The Plan also provides a means for the organized and responsible procedure for the safe return or confidential disposition of the patient records held by the Debtors as detailed above in this Disclosure Statement.  The trustee will oversee this process with the Debtors' records management team and outside professionals.

The Debtors submit that the Plan provides for the orderly liquidation of the Debtors' assets through a process that will maximize the value of these assets for the benefit creditors while protecting patients' interests in their medical records.

## C.    Designation of Claims and Interests

The following is a designation of the Classes of Claims and Equity Interests under the Plan.  In accordance with Bankruptcy Code section 1123(a)(1), Administrative Expenses, Professional Fee Claims, and Priority Tax Claims have not been classified and are excluded from the following Classes.  All Claims and Equity Interests, other than the Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in this section for all purposes, including voting, confirmation, and distributions pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Equity Interest is classified in a particular Class only to the extent that such Claim or Equity Interest is within the description of that Class and is classified in another Class to the extent that any remainder of such Claim or Equity Interest belongs within such other Class or Classes.  A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim in the Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

Class 1 – Priority Non-Tax Claims

Class 2 – Other Secured Claims

Class 3 – HCA Affiliation Agreement Claim

Class 4 – General Unsecured Claims

Class 5 – Equity Interests in Sadler

Class 6 – Equity Interests in MCMC

**D.      Estimated Size of Allowed Claims in Classes**

| Class | Impaired | Est. Amount | Recovery |
|:---:|:---:|---:|:---:|
| 1 | No | $1,700,000 | 100% |
| 2 | No | $10,000 | 100% |
| 3 | Yes | $3,378,000² | 100% |
| 4 | Yes | $31,000,000 | 4% |
| 5 | Yes | n/a | 0% |
| 6 | Yes | n/a | 0% |

**E.      Treatment of Claims and Interests**

**1.      Treatment of Unclassified Claims**

  **a.      Administrative Claims**.  Under the Plan, Administrative Claims include any right to payment constituting a cost or expense of administration of the Chapter 11 Cases Allowed under sections 328, 330, 364(c)(1), 365, 503(b), 507(a)(2), 507(b), and 1114(e) of the Bankruptcy Code, including (a) any actual and necessary costs and expenses of preserving the Debtors' estates, (b) any actual and necessary costs and expenses of operating the Debtors' businesses, (c) any indebtedness or obligations incurred or assumed by the Debtors during the Chapter 11 Cases, and (d) any compensation for professional services rendered and reimbursement of expenses incurred.  Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C. § 1930, is excluded from the definition of Administrative Claims and shall be paid in accordance with the Plan.

  The Plan provides that each holder of an Allowed Administrative Claim shall receive payment in full in Cash of the unpaid portion of such Allowed Administrative Claim (a) in the case of professional fees and expenses for advisors to the Debtors, as soon as entry of an order approving such Administrative Claims becomes a Final Order or, in the case of professionals retained by the Debtors in the ordinary course of their business, if any, on such terms as are customary between the Debtors and such professionals; (b) with respect to all other holders of Allowed Administrative Claims, on the later of (i) the Effective Date and (ii) the date on which such payment would be made in the ordinary course of the Debtors' business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements or regulations governing, instruments evidencing or other documents relating to such transactions, or (c) with respect to any Claims described in clauses (a) and (b) hereof, as otherwise agreed by the holder of such Claim and the Debtors.

  **b.      Professional Fee Claims**. Professional Fee Claims include all Claims of Professional Persons for compensation or reimbursement of costs and expenses relating to services performed after the Petition Date.

  All entities seeking awards by the Bankruptcy Court of Professional Fee Claims shall file

---

² This reflects the Debtors' belief that all claims scheduled as Contingent, Unliquidated and Disputed should be disallowed.

and serve on counsel for the Sadler Liquidation Trustee, the official committee of unsecured creditors, if one is appointed, the U.S. Trustee, and any other party specifically requesting a copy in writing, an application for its Professional Fee Claim no later than thirty (30) days after the Effective Date and be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) in accordance with the order relating to or Allowing any such Professional Fee Claim or (ii) one business day after such order being a Final Order. Any interested party desiring to object to any Professional Fee Claim must file and serve its objection on the counsel to the Sadler Liquidation Trustee, the official committee of unsecured creditors, if one is appointed, the U.S. Trustee, and the Professional Person to whose application the objection is addressed no later than twenty-three (23) days after the application has been filed and served.  Notwithstanding anything else provided herein, the Sadler Liquidation Trustee shall be authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

      **c.**    **Priority Tax Claims.**  Priority Tax Claims include all claims entitled to priority under section 507(a)(8) of the Bankruptcy Code.

      Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall, in full satisfaction, release and discharge of such Allowed Priority Tax Claim, receive, in the Sadler Liquidation Trustee's discretion, (a) on the applicable Distribution Date, Cash in an amount equal to such Allowed Priority Tax Claim, (b) such other treatment as to which the Debtors and the Holder of such Allowed Priority Tax Claim have agreed upon in writing or (c) such other treatment as will cause such Claim not to be Impaired; provided, however, that any such Priority Tax Claim not due and owing on the Effective Date will be paid when such Claim becomes due and owing.

      **2.**    **Treatment of Classified Claims**

      **a.**    **Class 1 – Priority Non-Tax Claims**.  Class 1 consists of all Allowed Priority Non-Tax Claims defined as a Claim entitled to priority under section 507(a) of the Bankruptcy Code that is not a Priority Tax Claim or an Administrative Claim.  The Debtors estimate Allowance of approximately $1.7 million in Priority Non-Tax Claims on the Effective Date.

      The Debtors estimate that all Allowed Priority Non-Tax Claims will be paid in full though the following treatment:  except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Non-Tax Claim shall receive Cash equal to its Allowed Claim, on the later of (i) the Effective Date, and (ii) the fifteenth (15th) Business Day after such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or, in either case, as soon thereafter as is practicable.

      Class 1 is Unimpaired under the Plan and, consequently, the Holders of Priority Non-Tax Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

      **b.**    **Class 2 – Other Secured Claims**.  Class 2 consists of all Secured Claims other than the HCA Affiliate Agreement Claim.  Pursuant to section 506 of the Bankruptcy

Code, Secured Claims include that portion of a Claim against any Debtor that is reflected in the schedules of assets and liabilities or a proof of Claim filed as a secured claim which is (a) secured by a valid, perfected and enforceable security interest, lien, mortgage or other encumbrance, that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of any Debtor in and to property of the relevant Estate, to the extent of the value of the Holder's interest in such property as of the relevant determination date or (b) Allowed as such pursuant to the terms of the Plan (subject to the occurrence of the Effective Date).  The defined term "Secured Claim" includes any Claim against any Debtor that is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff. The Debtors estimate Allowance of approximately $10,000 in Other Secured Claims on the Effective Date.

The Debtors estimate that all Allowed Other Secured Claims will be paid in full though the following treatment:  except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive Cash equal to its Allowed Claim, on the later of (i) the Effective Date, and (ii) the fifteenth (15th) Business Day after such Other Secured Claim becomes an Allowed Other Secured Claim, or, in either case, as soon thereafter as is practicable.

Class 2 is Unimpaired under the Plan and, consequently, the Holders of Other Secured Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

       **c.**      **Class 3 – HCA Affiliation Agreement Claim**. Class 3 includes the Claim of HCA against the Debtors arising from the Affiliation Agreement, dated as of February 17, 2012, between HCA and the Debtors that is purportedly secured by certain collateral of the Debtors. Prior to HCA voting on the Plan, the Debtors shall seek, pursuant to section 506(a) of the Bankruptcy Code, a determination on the Allowed Secured Claim of HCA, if any.

The Debtors estimate that the Allowed Claim of HCA will be paid in full over time though the following treatment:  except to the extent that the Holder of the HCA Affiliation Agreement Claim agrees to different treatment, in full and final satisfaction of each such Holder's Allowed HCA Affiliation Agreement Claim, on the Effective Date, the Holder of the HCA Affiliation Agreement Claim shall receive Cash from liquidation of the Debtors' Assets equal to its Allowed Claim, after payment of the Administrative Expenses of the Debtors, the Priority Tax Claims, and budgeted fees and expenses of the Liquidation Trust.

Class 3 is Impaired under the Plan and, consequently, the Holder of the HCA Affiliation Agreement Claim is entitled to vote on the Plan.

       **d.**      **Class 4 – General Unsecured Claims**. Class 4 includes any Claim other than an (a) Administrative Claim, (b) Priority Tax Claim, (c) Priority Non-Tax Claim, (d) Other Secured Claim, or (e) HCA Affiliate Agreement Claim.  The Debtors estimate Allowance of approximately $31,000,000 in General Unsecured Claims on the Effective Date.

The Debtors estimate that Allowed General Unsecured Claims will receive a recovery of 4% on the Allowed amount of their Claims through the following treatment: Class 4 Claims shall

be reviewed by the Debtors or the Sadler Liquidation Trustee, as appropriate, and shall be objected to or Allowed, in the discretion of the Debtors or the Sadler Liquidation Trustee.  Each Holder of an Allowed Class 3 Claim shall receive a Pro Rata beneficial interest in the Sadler Liquidation Trust.

Class 4 is Impaired under the Plan and, consequently, the Holders of General Unsecured Claims are entitled to vote on the Plan.

       **e.**    **Class 5 – Equity Interests in Sadler**. Class 5 includes the interest of any holders of equity securities of Sadler represented by issued and outstanding shares of common or preferred stock or other instruments evidencing a present ownership interest in Sadler, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest.

Holders of Equity Interests of Sadler shall receive a junior Pro Rata beneficial interest in the Sadler Liquidation Trust ("Equity Beneficial Interests").  Holders of the Equity Beneficial Interests of Sadler shall receive a distribution from the Sadler Liquidation Trust only after the General Unsecured Claims have been paid in full without interest.

Class 5 is Impaired, and Holders of Equity Interests in Sadler are entitled to vote to accept or reject the Plan.

       **f.**    **Class 6 – Equity Interests in MCMC**. Class 6 includes the interest of any holders of equity securities of MCMC represented by issued and outstanding shares of common or preferred stock or other instruments evidencing a present ownership interest in MCMC, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest.

Holders of Equity Interests of MCMC (including any and all Claims subordinated under section 510(b) of the Bankruptcy Code that are in any way arising from, of or in connection with such Equity Interests in MCMC) will not receive any distribution on account of such Equity Interests and such Equity Interests shall be cancelled as of the Effective Date.

Class 6 is Impaired, and Holders of Equity Interests in MCMC are not entitled to receive or retain any property under the Plan on account of such Equity Interests.  Therefore, Holders of Equity Interests in MCMC are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code, and Holders of Equity Interests in MCMC are not entitled to vote to accept or reject the Plan.

**F.**    **Means of Implementation of the Plan**

    **1.**    **Substantive Consolidation**.

The Plan is a joint plan for the Debtors that provides for the substantive consolidation of the Debtors' estates on the Effective Date.  Substantive consolidation results in the combination of both Debtors and their assets into a single pool from which the claims of all creditors are paid. claimants holding Claims against each of the Debtors based on the fact that the Debtors are jointly liable for the Claim shall be treated as having a single Claim against the Debtors'

combined estates to the extent the Claim is Allowed.  Any Intercompany Claims will not receive any distribution on account of such Claims and such Claims shall be discharged, cancelled, released, and extinguished as of the Effective Date. *See In re Babcock & Wilcox Co.*, 250 F.3d 955, 959 n. 5 (5th Cir. 2001) ("[substantive consolidation] usually results in, inter alia, pooling the assets of, and claims against, the two entities; satisfying liabilities from the resultant common fund; eliminating intercompany claims; and combining the creditors of the two companies for purposes of voting on reorganization plans").

Even though substantive consolidation was not codified in the Bankruptcy Code, the power is universally recognized as an equitable remedy available to the Bankruptcy Court under section 105 of the Bankruptcy Code. *See In re S.I. Acquisition, Inc.,* 817 F.2d 1142, 1144 n.2 (5th Cir. 1987)("The bankruptcy court has authority to order *de facto* disregard of the corporate form through [substantive] consolidation proceedings").  The Fifth Circuit has not specified a test for determining when substantive consolidation is appropriate. *See, i.e. In re Introgen Therapeutics, Inc.*, 429 B.R. 570 at 582 (Bankr. W.D. 2010). Generally, courts have applied two distinct types of tests: (i) a factor based test and (ii) a balancing test. *Id*. Recent Texas cases have adopted the balancing test, focusing on the impact of consolidating the creditors and weighing it against the benefits of consolidation.  *In re Introgen Therapeutics*, 429 B.R. at 583. A court looks to the reliance of the creditor to evaluate (1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity when extending credit, or (2) whether the affairs of the debtors are so entangled that consolidation benefits all creditors.  *Id*.

The Debtors meet both of the balance test factors.  First, substantially all of the Debtors' creditors dealt with Sadler and MCMC as one entity when extending credit or otherwise conducting business.  For example, while Sadler performed all account receivable billing for the operation of the Clinics, MCMC recorded all the resulting receivables as its own assets on MCMC's audited financials.  The Debtors provided these consolidated MCMC financials to any creditor requesting financial information, failing to differentiate between the Debtors.  The Debtors are also co-liable for many, if not most, of the debts at issue in these chapter 11 Cases. For example, upon termination of the Management Services Agreement between Sadler and MCMC, Sadler becomes liable for all MCMC's debts, contracts and leases related to MCMC's performance under the Management Services Agreement.  The Debtors' operations, assets and debts are substantially entangled, as the Debtors' only business was the operation of the Clinics. The Plan's substantive consolidation of the Debtors will not prejudice the creditors as the creditors already treat the Debtors as one entity.

### 2.     The Sadler Liquidation Trust

As detailed in the Plan, on the Effective Date, the Debtors will transfer all Assets to the Sadler Liquidation Trust to be administered by the Sadler Liquidation Trustee for the benefit of Creditors with Allowed Claims, with the oversight of the Sadler Liquidation Trust Advisory Committee. This section describes the formation and operation of the Sadler Liquidation Trust, the powers and duties of the Sadler Liquidation Trustee and the responsibilities and Sadler Liquidation Trust Advisory Committee.

**a.     Sadler Liquidation Trustee.**  As of the Effective Date, John T. Young, Jr. shall be appointed as the Sadler Liquidation Trustee in accordance with section 1123(b)(3)(B)

of the Bankruptcy Code and shall enter into the Sadler Liquidation Trustee Agreement attached as Exhibit 3 with this Disclosure Statement.  Mr. Young shall be approved as the Sadler Liquidation Trustee by the Bankruptcy Court at the Confirmation Hearing.

The Sadler Liquidation Trustee shall be responsible for, among other things, the following:

a)   resolving, paying and satisfying all Administrative Claims and Allowed Claims in accordance with this Plan, the Sadler Liquidation Trust Agreement and the Confirmation Order;

b)   receiving, preserving, holding managing, liquidating and maximizing the Assets;

c)   acting as the representative of the Estate, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code;

d)   objecting to any Claim or Administrative Claim filed or asserted against the Debtors or the Estate;

e)   preparing and filing the Debtors Final Form 5500 and making all other legally required final reports; and

f)   taking other actions deemed to be in the best interests of the Estate and authorized or required under the Sadler Liquidation Trust Agreement.

**b.     Sadler Liquidation Trust Advisory Committee**. The initial members of the Sadler Liquidation Advisory Committee shall be the three Persons (each of whom must have or be designated as a representative of a Person with an Allowed Claim in Class 4).  The representatives shall be submitted to the Bankruptcy Court for approval and appointment as the initial members of the Sadler Liquidation Trust Advisory Committee.  The members of the Sadler Liquidation Trust Advisory Committee shall consult with and advise the Sadler Liquidation Trustee regarding the administration of the Sadler Liquidation Trust, pursuant to the terms of this Plan and the Sadler Liquidation Trust Agreement.  In addition, the Sadler Liquidation Trust Advisory Committee shall have the power to request, by motion and after notice and a hearing, that the Bankruptcy Court: (a) remove the Sadler Liquidation Trustee for good cause, or (b) appoint a disinterested individual to serve as the successor Sadler Liquidation Trustee in the event the existing Sadler Liquidation Trustee resigns, is removed or becomes incapacitated.  No member of the Sadler Liquidation Trust Advisory Committee shall receive compensation for serving on that body.

**c.     Vesting of Assets in the Sadler Liquidation Trust.**  On the Effective Date, except as otherwise provided in this Plan, all of the Assets remaining in the Sadler Estate shall vest in the Sadler Liquidation Trust free and clear of all liens, claims and interests of creditors.

**G.     Treatment of Executory Contracts and Unexpired Leases**

1.        **Assumption**

As of and subject to the occurrence of the Effective Date, the Health Care Record Maintenance Agreements and the D&O Liability and Insurance Policies (the "Assumed Executory Contracts"), shall be deemed assumed.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interests of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases.  In addition, the Confirmation Order shall constitute a finding of fact and conclusion of law that (i) each Assumed Executory Contract assumed hereunder is an executory contract which may be assumed by the Debtors, (ii) there are no defaults of the Debtors, no cure amounts owing pursuant to section 365(b)(i) of the Bankruptcy Code (the "Cure Amount"), no compensation due for any actual pecuniary loss and there is adequate assurance of future performance with respect to each Assumed Executory Contract, (iii) such assumption is in the best interest of the Debtors and their estates, (iv) upon the Effective Date, the Assumed Executory Contracts constitute legal, valid, binding and enforceable contracts in accordance with the terms thereof, and (v) the counter party to each Assumed Executory Contract is required to and ordered to perform under and honor the terms of the Assumed Executory Contract.

The Assumed Executory Contracts shall be assumed and assigned to the Sadler Liquidation Trustee and be fully enforceable by the Sadler Liquidation Trustee in accordance with its terms.  Nothing in the Plan or any Plan Document shall create any obligation or liability on the part of any Debtor, the Sadler Liquidation Trust or any other Person that does not currently have such liability or obligation, with respect to any executory contract or unexpired lease.

The Assumed Executory Contracts shall include all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Assumed Executory Contract.

In the event of a dispute (each, a "Cure Dispute") regarding:  (i) the Cure Amount; (ii) the ability of the Sadler Liquidation Trustee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (iii) any other matter pertaining to the proposed assumption, any party in interest may file an objection to confirmation pursuant to the procedures established in the order approving the Disclosure Statement.  Any objection that raises a Cure Dispute must identify the disputed executory contract and set forth with particularity the basis of the Cure Dispute.  To the extent a Cure Dispute relates solely to the Cure Amount, the applicable Debtor may assume the applicable contract or lease prior to the resolution of the Cure Dispute provided that such Debtor reserves Cash in an amount sufficient to pay the full amount asserted as cure payment by the non-Debtor party to such contract or lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court).  Any party that fails to object shall be forever barred, estopped and enjoined from raising a Cure Dispute in the Bankruptcy Court, in any other court, in any arbitration or otherwise.

2.        **Rejection**

Effective on and as of the Effective Date, all of the Debtors' and the Estates' Executory Contracts, except for the Assumed Executory Contracts, shall be deemed rejected pursuant to section 365 of the Bankruptcy Code.  The Confirmation Order, subject to the occurrence of the Effective Date, shall constitute approval of such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Claims for damages allegedly arising from the rejection pursuant to this Plan or the Confirmation Order of any Executory Contract, whether rejected prior to the Effective Date or deemed rejected as a result of this Plan, must be filed with the Bankruptcy Court and served on the Sadler Liquidation Trustee not later than thirty (30) days after the Effective Date.  All Claims for such damages not timely filed and properly served as prescribed herein shall be forever barred and the holder of such a Claim shall not be entitled to participate in any distribution or payment, on account of such Claim, under the Plan or payment from the Sadler Liquidation Trustee.

3.        **Indemnification of Directors, Officers and Employees**

For purposes of the Plan, the obligation of the Debtors to exculpate, indemnify and advance any expenses to any Person serving at any time before, on or after the Petition Date as one of its current, former and future directors or officers (each, an "Indemnitee") by reason of such Person's service in such capacity, for acts or omissions occurring at or prior to the consummation of the Plan, whether asserted or claimed prior to, at or after the consummation of the Plan, to the extent provided in such Debtor's Corporate Documents, a written agreement with the Debtor, in accordance with any applicable law, or any combination of the foregoing or otherwise, shall:  (a) survive confirmation of the Plan and the Effective Date and continue in full force and effect (and not be modified, amended or terminated in any manner adverse to any Indemnitee without the written consent of the affected Indemnitee); (b) become an obligation of the Sadler Liquidation Trustee; and (c) not be discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Petition Date.

H.        **Distributions**

1.        **Timing and Calculation of Amounts to Be Distributed**

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant

to the provisions set forth in section 10 of the Plan.  Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 2.      Disbursing Agent

Except as otherwise provided herein, all distributions under the Plan shall be made by the Sadler Liquidation Trustee as Disbursing Agent or such other Entity designated by the Sadler Liquidation Trustee as a Disbursing Agent on the Effective Date.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  In the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Sadler Liquidation Trust.

**a.      Powers of the Disbursing Agent**.  The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

**b.      Expenses Incurred On or After the Effective Date**.  Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Sadler Liquidation Trust.

### 3.      Distributions on Account of Claims Allowed After the Effective Date

**a.      Payments and Distributions on Disputed Claims**.  Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

**b.      Special Rules for Distributions to Holders of Disputed Claims**. Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Sadler Liquidation Trustee, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

### 4.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.

**a.      Delivery of Distributions in General**. Except as otherwise provided herein, the Sadler Liquidation Trustee shall make distributions to Holders of Allowed Claims at

the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined at the discretion of the Sadler Liquidation Trustee; and provided, further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in the Debtors' books and records or, as applicable, any proof of Claim filed by that Holder.

       **b.**    **Minimum Distributions.**  The Sadler Liquidation Trustee shall not be required to make payments of less than $50.  If a payment is not made as a result of the foregoing provision, the distribution amount shall accrue on account of the applicable Holder until the aggregate amount to be distributed on account of such Holder is at least $50.

       **c.**    **Undeliverable Distributions and Unclaimed Property.**  In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Sadler Liquidation Trust (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such Claim shall be discharged and forever barred.

       **d.**    **Compliance with Tax Requirements/Allocations.**  In connection with the Plan, to the extent applicable, the Sadler Liquidation Trust shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Sadler Liquidation Trustee and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Sadler Liquidation Trustee reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens and encumbrances.  Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

       **e.**    **Setoff.**  The Sadler Liquidation Trustee may withhold (but not set off except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights, and causes of action of any nature that the Debtors or Sadler Liquidation Trust may hold against the Holder of any such Allowed Claim.  In the event that any such claims, equity interests, rights, and causes of action of any nature that the Sadler Liquidation Trustee may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any

Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim) the amount of any adjudicated or resolved claims, equity interests, rights, and causes of action of any nature that the Debtors or the Sadler Liquidation Trust may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount.  Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Sadler Liquidation Trustee of any such claims, equity interests, rights, and causes of action that the Debtors or the Sadler Liquidation Trustee may possess against any such Holder, except as specifically provided herein.

**I.      Causes of Action**

**A.      Retention of Causes of Action**

Included in the Assets the Debtors will transfer to the Sadler Liquidation Trust are all Litigation Claims the Debtors may have against any other party.  The Sadler Liquidation Trustee will investigate, and if deemed appropriate, prosecute and collect any Litigation Claims for the benefit of Creditors with Allowed Claims. The Debtors are still completing their investigation of possible Litigation Claims and will supplement this Disclosure Statement with additional information as this investigation advances.

**1.      Litigation Claims Against HCA**

The Debtors have identified potential Litigation Claims against HCA, HCAPS and the Advisory Board appointed by HCA.  These causes of action arise as a result of damages suffered by the Debtors and their creditors from HCA's prepetition actions and omissions in connection with the Asset Purchase Agreement and Affiliation Agreement described above.  Potential Litigation Claims the Sadler Liquidation Trustee may assert against HCA, HCAP and the Advisory Board, include, among other claims and causes of action:

a)      Fraudulent inducement against HCA and HCAPS;

b)      Tortious interference with contract against HCA and HCAPS;

c)      Breach of contract against HCAPS;

d)      Fraudulent transfer under Bankruptcy Code §§ 548 and 544 and the Texas Uniform Fraudulent Transfer Act against HCAPS;

e)      Preferential transfer against HCAPS;

f)      Breach of fiduciary duty against HCAPS and the Advisory Board members appointed by HCAPS; and

g)      Conversion of fiduciary property Advisory Board the Advisory Board members appointed by HCAPS.

The Plan transfers all of the Debtors' Litigation Claims against HCA, HCAPS and the Advisory Board members appointed by HCAPS to the Sadler Liquidation Trust, for investigation and prosecution by the Sadler Liquidation Trustee.    The Debtors have not competed their investigation and analysis of the Litigation Claims against HCA, HCAPS and the Advisory Board Members appointed by HCAPS.   Accordingly, the Debtors cannot estimate potential recoveries, if any, from possible Litigation Claims.

**HCA, HCAPS AND THE ADVISORY BOARD MEMBERS APPOINTED BY HCAPS ARE HEREBY PUT ON NOTICE THAT THE DEBTORS AND/OR THE SADLER LIQUIDATION TRUSTEE WILL PROSECUTE THE LITIGATION CLAIMS AGAINST THEM.   THE PLAN IS NOT INTENDED AND DOES NOT WAIVE ANY OF DEBTORS' LITIGATION CLAIMS.**

### 2.        Preferences

Pursuant to the Bankruptcy Code, Debtors may recover certain preferential transfers of property, including cash, made while insolvent during the ninety (90) days immediately prior to the filing of its bankruptcy petition with respect to pre-existing debts to the extent the transferee received more than it would have in respect of the pre-existing debt had the Debtors been liquidated under Chapter 7 of the Bankruptcy Code.  In the case of "insiders," the Bankruptcy Code provides for a one-year preference period.  There are certain defenses to preference actions. Transfers made in the ordinary course of the Debtors' and the transferee's business according to the ordinary business terms are not recoverable.  If the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension may constitute a defense, to the extent of any new value, against any otherwise recoverable transfer of property.  If a transfer is recovered by the Debtors, the transferee has a general unsecured claim against the Debtors to the extent of the recovery.

### 3.        Fraudulent Transfers

Under the Bankruptcy Code and various state laws, a Debtors may recover certain transfers of assets, including the grant of a security interest, made while insolvent or which rendered it insolvent if, and to the extent, the Debtors receives less than fair value for such asset. The Debtors may also recover certain transfers if the transfer was made with actual intent to hinder, delay or defraud any creditor.  These transfers are referred to as "fraudulent transfers."

### 4.        Transfers by the Debtor

The Debtors' statements of financial affairs, which are incorporated by reference herein, include listings of payments the Debtors made in the ninety (90) days immediately preceding the Petition Date as well as listings of payments the Debtors made to insiders in the year immediately preceding the Petition Date (each with respect to preferences) and payments the Debtors made in the two years immediately preceding the Petition Date (with respect to fraudulent transfer claims arising solely under the Bankruptcy Code as opposed to claims under applicable non-bankruptcy law that may be asserted under the Bankruptcy Code. The Debtors' statements of financial affairs therefore identify recipients of transfers that may be avoided by

the Debtors and/or the Sadler Liquidation Trustee as preferences and/or fraudulent transfers. The Debtors are in the process of conducting an analysis of potential preferences paid to their vendors, insiders and other creditors and of potential fraudulent transfers paid to transfer recipients. Other than these analyses, no analysis of the merits of causes of action has been made at this time. While the Debtors attempted to list all recipients of the foregoing transfers in their statements of financial affairs, it is possible that through further investigation the Debtors or the Sadler Liquidation Trustee may identify additional recipients of potential preferences and/or fraudulent transfers. Accordingly, the Debtors cannot estimate potential recoveries, if any, from possible litigation surrounding such transfers or obligations.

**ALL CREDITORS AND RECIPIENTS OF PAYMENTS OR TRANSFERS THAT MAY BE DEEMED PREFERENCES OR FRAUDULENT TRANSFERS, WITH ACTUAL OR CONSTRUCTIVE NOTICE OF THESE BANKRUPTCY CASES ARE HEREBY PUT ON NOTICE THAT THE SADLER LIQUIDATION TRUSTEE WILL PROSECUTE THESE CLAIMS. THIS PLAN IS NOT INTENDED AND DOES NOT WAIVE ANY OF DEBTORS' LITIGATION CLAIMS.**

**J.      U.S. Trustee Quarterly Fees**

The Debtors shall be responsible for timely payment of United States Trustee quarterly fees incurred pursuant to 28 U.S.C. § 1930(a)(6). Any fees due as of the date of confirmation of the Plan will be paid in full on or before the Effective Date of the Plan. After confirmation, the Trustee shall pay United States Trustee quarterly fees as they accrue until their cases are closed by the Court. The Sadler Liquidation Trustee shall file with the Court and serve on the United States Trustee a financial report for each quarter, or portion thereof, that their Chapter 11 cases remains open in a format prescribed by the United States Trustee.

**VII.**

**FEASIBILITY AND RISKS**

**A.      Business Risks**

The Debtors' Plan and the recovery projections in this Disclosure Statement are based on anticipated recoveries from the monetization of the Debtors' assets, including, but not limited to, accounts receivable related to reimbursements owed by Medicare, Medicaid, other state, federal and local programs and private insurers and payers. The Debtors believe their collection projections are reasonable will provide the Debtors and Sadler Liquidation Trust sufficient revenues to fund distributions to creditors and support confirmation of the Plan. Nevertheless, all claimants should consider these and all risks in voting on the Plan.

**THIS DISCLOSURE STATEMENT AND THE MATERIAL INCORPORATED BY REFERENCE HEREIN (THE "INCORPORATED MATERIALS") INCLUDE "FORWARD-LOOKING STATEMENTS" AS DEFINED IN SECTION 27A OF THE SECURITIES ACT OF 1933 AND**

SECTION 21 E OF THE SECURITIES EXCHANGE ACT OF 1934.  ALL STATEMENTS OTHER THAN STATEMENTS OF HISTORICAL FACTS INCLUDED IN THIS DISCLOSURE STATEMENT AND THE INCORPORATED MATERIALS REGARDING THE DEBTORS' FINANCIAL POSITION, THE VALUE AND COLLECTABILITY OF ASSETS, INCLUDING WITHOUT LIMITATION, ACCOUNTS RECEIVABLE, INCLUDING BUT NOT LIMITED TO STATEMENTS USING WORDS SUCH AS "ANTICIPATES," "EXPECTS," "ESTIMATES," "BELIEVES" AND "LIKELY" ARE FORWARD-LOOKING STATEMENTS.  THE DEBTORS BELIEVE THAT THEIR CURRENT VIEWS AND EXPECTATIONS ARE BASED ON REASONABLE ASSUMPTIONS; HOWEVER, THERE ARE SIGNIFICANT RISKS AND UNCERTAINTIES THAT COULD SIGNIFICANTLY AFFECT EXPECTED RESULTS.  IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE IN THE FORWARD-LOOKING STATEMENTS ("CAUTIONARY STATEMENTS") ARE DISCLOSED THROUGHOUT THIS DISCLOSURE STATEMENT AND INCLUDE, WITHOUT LIMITATION, THE RISK FACTORS DISCUSSED HEREIN, CHANGES IN FEDERAL, STATE OR LOCAL LAW OR REGULATION, CHANGES TO THE MEDICARE, MEDICAID OR OTHER INSURANCE OR REIMBURSEMENT PROGRAMS, THE FUNDING OF THESE PROGRAMS, CHANGES IN THE FINANCIAL CONDITION OF ANY PARTY OWING ACCOUNTS RECEIVABLE, AND ANY OTHER EVENT OR CONTINGENCY THAT MAY IMPACT THE ABILITY OF THE DEBTORS AND/OR SADLER LIQUIDATION TRUSTEE TO COLLECT ACCOUNTS RECEIVABLE OR THE ABILITY OF COUNTERPARTIES TO PAY ANY ACCOUNTS RECEIVABLE.  ALL WRITTEN AND ORAL FORWARD-LOOKING STATEMENTS ATTRIBUTABLE TO THE DEBTORS, OR PERSONS ACTING ON THEIR BEHALF, ARE EXPRESSLY QUALIFIED IN THEIR ENTIRETY BY THE CAUTIONARY STATEMENTS.  THE DEBTORS DO NOT INTEND TO UPDATE OR OTHERWISE REVISE THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN TO REFLECT EVENTS OR CIRCUMSTANCES AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

**B.**      **Risk of Non-confirmation of the Plan**

In the event the Debtors' Plan is not confirmed, the Court may consider other reorganization plans, dismiss the case or convert the case to a chapter 7 case.

**C.**      **Non-occurrence of Effective Date of the Plan**

Even if all Classes of Claims and Interests that are entitled to vote accept the Plan, the Plan may not become effective.  The Plan sets forth conditions to the occurrence of the Effective Date of the Plan which may not be satisfied.   The Debtors believe they will satisfy all

requirements for consummation under the Plan.  There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for consummation of the Plan have been satisfied.

**D.      Risk of Account Receivable Softness**

The Debtors will fund the distributions and recoveries provided by the Plan primarily through the collection of the AR Assets.  The majority of the AR Assets are receivables generated from the Debtors' provision of medical services to patients and are owed by commercial health insurance companies (Aetna, Blue Cross and Blue Shield, Cigna, etc.) and governmental programs (Medicare, Medicaid, etc.).  The billing and collection of these medical receivables are subject to strict regulations and procedures.  Payers routinely deny the payment of legitimate claims based on minor technical defects, including applying aggressive deadlines for the presentment of receivables and for responding to any resulting challenges.  Further, Medicare, Medicaid and other governmental payers are subject to governmental budget constraints that can significantly delay collection or reduce recoveries.  Current economic instability, as well as uncertainty in governmental regulation of the healthcare industry all contribute to potential softness in the collection of the AR Assets.  Any change in the economic health of a payer, changes in governmental regulation and policies, and numerous other factors may impact the collectability of the AR Assets.

**In summary, the collection of the AR Assets is subject to numerous variables and is unpredictable.  Accordingly, the Debtors cannot guaranty the collection rates and recovery estimates provided in this Disclosure Statement and the Liquidation Analysis.**

**VIII.**

**ALTERNATIVES TO PLAN AND LIQUIDATION ANALYSIS**

There are three possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan: (a) the Bankruptcy Court could dismiss the Debtors' chapter 11 cases, (b) the Debtors' chapter 11 cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code, or (c) the Bankruptcy Court could consider an alternative plan of reorganization or liquidation proposed by some other party.

**A.      Dismissal**

If the Debtors' chapter 11 cases were dismissed, the Debtors would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code.  In such a scenario, the Debtors believe that HCA would foreclose on its collateral, including the Debtors' accounts receivable, leaving no material assets for General Unsecured Creditors. Accordingly, the Debtors believe General Unsecured Creditors would not receive a recovery on their Claims.

**B.      Chapter 7 Liquidation**

If the Plan is not confirmed, it is likely that the Debtors' chapter 11 cases would be converted to cases under chapter 7 of the Bankruptcy Code.  In chapter 7, the Court would appoint (or the creditors elect) a trustee to liquidate the Debtors' assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code.  Whether a bankruptcy case is one under chapter 7 or chapter 11, Secured Creditors, Administrative Expenses and Priority Claims are entitled to be paid in cash and in full before General Unsecured Creditors receive any funds.

If the Debtors' chapter 11 cases are converted to chapter 7, the present Administrative Expenses may have a priority lower than priority claims generated by the chapter 7 case, such as the chapter 7 trustee's fees or the fees of attorneys, accountants and other professionals engaged by the trustee.

Based on the opinion of the Debtors, the Debtors' creditors will receive substantially less in a liquidation of the Debtors' assets under chapter 7.  Specifically, the conversion to chapter 7 would significantly delay the collection of the Debtors' accounts receivable, significantly reducing the value of the receivables for Creditors.  Further, any appointed trustee is unlikely to have the same expertise in collecting health care receivables as the Debtors' collection team.  Thus, it is very possible that recoveries on accounts receivable will be substantially lower in a chapter 7, resulting in General Unsecured Claims receiving no distribution on their Claims.  A copy of the Debtors' liquidation analysis is attached as Exhibit 2.

**C.      Alternative Plan**

It is possible that other liquidation reorganization plans may be submitted in the event that the Debtors' Plan is not confirmed.  The Debtors cannot accurately predict all possible plans that could be proposed; however, in general, the delay in confirmation caused by an alternative plan would significantly delay the collection of the Debtors' accounts receivable, significantly reducing the value of the receivables for Creditors.  Further, any alternative plan is unlikely to bring the same expertise in collecting health care receivables as the Debtors' collection team.  Thus, it is very possible that recoveries on accounts receivable will be substantially lower in an alternative plan, resulting in General Unsecured Claims receiving no distribution on their Claims.

**IX.**

**CERTAIN UNITED STATES FEDERAL INCOME
TAX CONSEQUENCES OF THE PLAN**

**THE FOLLOWING DISCUSSION IS A SUMMARY OF CERTAIN SIGNIFICANT FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE DEBTORS AND TO HOLDERS OF CLAIMS AND EQUITY INTERESTS AND IS BASED ON THE INTERNAL REVENUE CODE OF 1986 (TITLE 26, UNITED STATES CODE), AS AMENDED TO THE DATE HEREOF (THE "TAX CODE"), TREASURY REGULATIONS PROMULGATED AND PROPOSED THEREUNDER, JUDICIAL DECISIONS AND PUBLISHED ADMINISTRATIVE RULES AND**

PRONOUNCEMENTS OF THE IRS AS IN EFFECT ON THE DATE HEREOF. CHANGES IN SUCH RULES OR NEW INTERPRETATIONS THEREOF COULD SIGNIFICANTLY AFFECT THE TAX CONSEQUENCES DESCRIBED BELOW. NO RULINGS HAVE BEEN REQUESTED FROM THE IRS. MOREOVER, NO LEGAL OPINIONS HAVE BEEN REQUESTED FROM COUNSEL WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN.

THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN TO THE HOLDERS OF CLAIMS AND EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. IN ADDITION, THIS DISCUSSION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR THE HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS (SUCH AS HOLDERS WHO DO NOT ACQUIRE THEIR CLAIM ON ORIGINAL ISSUE), NOR DOES THE DISCUSSION DEAL WITH TAX ISSUES PECULIAR TO CERTAIN TYPES OF TAX PAYERS (SUCH AS DEALERS IN SECURITIES, S CORPORATIONS, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX-EXEMPT ORGANIZATIONS AND FOREIGN TAXPAYERS). NO ASPECT OF FOREIGN, STATE, LOCAL OR ESTATE AND GIFT TAXATION IS ADDRESSED.

THE FOLLOWING SUMMARY IS, THEREFORE, NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR EQUITY INTEREST. HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES PECULIAR TO THEM UNDER THE PLAN. THE DEBTORS ASSUMES NO RESPONSIBILITY FOR THE TAX EFFECT THAT CONFIRMATION AND RECEIPT OF ANY DISTRIBUTION UNDER THE PLAN MAY HAVE ON ANY GIVEN CREDITOR OR OTHER PARTY IN INTEREST.

## A.    General

No administrative rulings will be sought from the Internal Revenue Service (hereinafter "IRS") with respect to any of the federal income tax aspects of the Plan. Consequently, there can be no assurance that the treatment described in the Plan will be accepted by the IRS. No opinion of counsel has either been sought or obtained with respect to the federal income tax aspects of the Plan.

B.      **IRS Circular 230 Disclosure**

**THIS DISCLOSURE STATEMENT IS WRITTEN TO SUPPORT THE PROMOTION OR THE MARKETING OF TRANSACTIONS DISCUSSED HEREIN.   TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, THE DEBTORS ARE INFORMING YOU THAT THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES THAT MAY BE IMPOSED ON SUCH TAXPAYER UNDER THE TAX CODE. TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

C.      **Consequences to Holders of Claims**

1.      **Realization and Recognition of Gain or Loss in General**

Although the Debtors do not believe that the transfer of the Assets to the Sadler Liquidation Trust under the Plan will be considered a taxable event, all Creditors and Equity Interest holders may, at some point in time, be required to recognize income or be allowed a deduction as a result of the Plan's implementation.  The exact tax treatment depends on each Creditor's or Equity Interest holder's method of accounting, the basis for their Claim or Equity Interest, the amount of distributions received, and upon the extent (if any) to which such Creditor has taken a bad debt reduction in prior tax years with respect to a particular debt owed to it by the Debtors.  In the event that the Sadler Liquidation Trust is treated as a grantor trust for the benefit of Creditors, any income, gain or loss attributable to operation, ownership, or disposition of the trust assets would be taxable to Creditors, in accordance with their interest in trust assets, whether or not the Creditors had received any cash distributions from the trust.  Gain or loss on the subsequent disposition of trust assets would be equal to the difference between the amount realized on the disposition of those assets and their tax bases in the hands of the trust (initially, the trust assets' fair market value at the time of their transfer to the trust).

2.      **Accrued Interest**

In general, to the extent any amount received by a holder of an Allowed Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally will recognize a deductible loss to the extent any accrued interest claimed was previously included in gross income and is not paid in full.  Each holder of an Allowed Claim is urged to consult its tax advisor regarding the allocation of consideration and deductibility of unpaid interest for tax purposes.

A holder, who, under his accounting method, was not previously required to include in income, accrued but unpaid interest attributable to its existing Allowed Claims, and who exchanges its interest Claim for cash, or other property, pursuant to the Plan will be treated as receiving ordinary interest income to the extent of any consideration so received allocable to

such interest, regardless of whether that holder realizes an overall gain or loss as a result of the exchange of its existing Allowed Claims.

### 3.        Withholding

All distributions to holders of Allowed Claims under the Plan are potentially subject to any applicable withholding.   Under federal income tax law, interests, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding". Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.   Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS IN DETERMINING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES TO THEM OF THE PLAN.**

### D.        Tax Consequences to the Debtors

Under the Plan, the Debtors' Assets will be transferred to the Sadler Liquidation Trust. Because income from the trust assets may only be used to pay the Debtors' liabilities, the Debtors believes that (i) the transfer of trust assets to the Sadler Liquidation Trust under the Plan will not constitute a taxable disposition of such assets, (ii) the Sadler Liquidation Trust should be classified for all federal income tax purposes as a "grantor" trust of which the Debtors are the grantors, and (iii) any federal income tax liability of the Debtors attributable to the trust assets or operations should be paid by the Sadler Liquidation Trust.  The Debtors also believe that they should be entitled to utilize any NOLs to offset in whole or in part any regular tax liability that may relate to, or arise from, the transfer, retention, vesting and liquidation of Assets and/or operation of the Sadler Liquidation Trust.

If the IRS were to successfully assert that the Creditors are the grantors of the Sadler Liquidation Trust, the Debtors would recognize gain or loss on the transfer of the Assets to the trust in an amount equal to the difference between the fair market value of the Assets transferred and the tax basis of those assets.  The Debtors' NOLs may be sufficient to offset any resulting gain for regular tax purposes, but the Debtors might owe alternative minimum tax on any such gain.   Special limitations on the utilization of NOLs may apply if the Debtors become subject to the alternative minimum tax ("AMT").

The federal income tax consequences of the Plan are complex and subject to uncertainties.   The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.   Thus, no assurance can be given as to the interpretation that the IRS will adopt.  In addition, this summary does not address foreign, state or local tax consequences of the Plan, and it does not purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-

dealers, banks, insurance companies, financial institutions, small business investment corporations, regulated investment companies, tax-exempt organizations or investors in pass through entities).

## X.
## CONCLUSION

This Disclosure Statement has attempted to provide information regarding the Debtors' bankruptcy estates and the potential benefits that accrue to holders of Claims against the Debtors under the Plan as proposed.  The Debtors urge the creditors to vote in favor of the Plan.

Respectfully Submitted this 15th day of June, 2012.

SADLER CLINIC PLLC

/s/  *Leslie Schoppe, M.D*_____
Title:  Member of the Board of Managers

MONTGOMERY COUNTY MANAGEMENT COMPANY, LLC

/s/ *John T. Young, Jr.*_____
Title: Chief Restructuring Officer

DIAMOND MCCARTHY LLP

/s/ *Jason M. Rudd*_____
Kyung S. Lee
*klee@diamondmccarthy.com*
TBA No. 12128400
Jason M. Rudd
*jrudd@diamondmccarthy.com*
TBA No. 24028786
Charles M. Rubio *(pro hac vice pending)*
*crubio@diamondmccarthy.com*
NYB No. 4583134
909 Fannin, Suite 1500
Houston, Texas  77010
Telephone: (713) 333-5100
Facsimile: (713) 333-5195

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS-IN-POSSESSION